768 So.2d 1037 (2000)
Dominick OCCHICONE, Appellant,
v.
STATE of Florida, Appellee.
No. SC93343.
Supreme Court of Florida.
June 29, 2000.
Rehearing Denied October 10, 2000.
*1038 Harry P. Brody, Assistant CCRC, and John P. Abatecola, Staff Attorney, Capital Collateral Regional Counsel-Middle, Tampa, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
We have for review the denial of Dominick Occhicone's initial motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the following reasons, we affirm the trial court's denial.

PROCEEDINGS TO DATE
In 1986, Occhicone was convicted for the first-degree murders of the mother and *1039 father of his former girlfriend, Anita Gerrety. The circumstances of the murders were described by this Court on direct appeal:
In the early morning hours of June 10, 1986 Occhicone awakened his former girlfriend by knocking on the sliding glass door to her bedroom in a house she shared with her children and her parents. The woman refused to talk with him and he left. He returned an hour or so later, armed with a handgun, and cut the telephone lines and roused the household. When the woman's father confronted him outside the house, Occhicone shot him. The woman and her daughter fled the house while Occhicone was breaking into it through a locked door. Once inside Occhicone shot the woman's mother four times.
Occhicone v. State, 570 So.2d 902, 904 (Fla. 1990). At trial, Occhicone asserted a voluntary intoxication defense claiming that his level of intoxication on the night of the murders, as well as his documented drinking habit, prevented him from having the requisite mental state to premeditate the murders. However, the jury found him guilty and recommended the death penalty for both murders by a seven-to-five vote.
Although the trial judge sentenced Occhicone to life in prison for the murder of his ex-girlfriend's father, he sentenced him to death for the murder of her mother. In support of the death sentence, the trial judge found three aggravating factors: (1) previous conviction of a violent felony; (2) murder committed during a burglary; and (3) murder committed in a cold, calculated, and premeditated manner. As statutory mitigation, the trial judge found that the murder was committed while Occhicone was under the influence of extreme mental and emotional disturbance. Finally, as nonstatutory mitigation, the judge found that Occhicone was a good prisoner and had acclimated to his custodial environment. On appeal, this Court affirmed Occhicone's conviction and sentence. See Occhicone v. State, 570 So.2d 902 (Fla.1990). The United States Supreme Court denied Occhicone's petition for writ of certiorari on May 20, 1991. See Occhicone v. Florida, 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 471 (1991). On July 7, 1992, Occhicone filed a petition for writ of habeas corpus in this Court, which was denied on April 8, 1993. See Occhicone v. Singletary, 618 So.2d 730 (Fla.1993).
On May 20, 1993, Occhicone filed his initial 3.850 motion raising seven issues.[1] The trial court summarily denied claims (1), (4), (5), (6), and (7) in their entirety and claims (2) and (3) in part. The trial court then conducted an evidentiary hearing on the remaining portions of Occhicone's ineffective assistance of counsel allegations contained in claims (2) and (3), and subsequently denied the remaining portions of these claims.

APPEAL
On appeal, Occhicone raises a number of issues relating to the trial court's denial of his claims.[2] We conclude *1040 some of these issues are procedurally barred,[3] and, upon review, find the rest are without substantial merit.

CLAIMS SUMMARILY DENIED
Occhicone alleges that the lower court erred in summarily denying several of his *1041 other claims including: his Brady claim, the claim that the State presented false evidence, his competency to stand trial claim, and parts of his ineffective assistance of counsel claims.
To uphold the trial court's summary denial of claims raised in a 3.850 motion, the claims must be either facially invalid or the record must conclusively refute them. See Fla. R.Crim. Pro. 3.850(d); Peede v. State, 748 So.2d 253 (Fla.1999); Rivera v. State, 717 So.2d 477 (Fla.1998). Further, where no evidentiary hearing is held below, we must accept the defendant's factual allegations as true to the extent they are not refuted by the record. See Peede, 748 So.2d at 257; see also Lightbourne v. Dugger, 549 So.2d 1364, 1365 (Fla.1989); Harich v. State, 484 So.2d 1239, 1241 (Fla.1986).
As his first claim, Occhicone alleges that the State withheld the names of material witnesses Lilly Lawson, Anita Gerrety, Debra Newell, Phillip Baker, David Hoffman, Barbara Talbert, and Kimberly Connell, all of whom had information of Occhicone's intoxication on the night of the offense and would have assisted the presentation of his voluntary intoxication defense. As to witnesses Hoffman and Talbert, Occhicone maintains that the State withheld notes of interviews it had with each one of them in which they told the State they saw Occhicone on the day of the murders at Shooter's Bar. Specifically, Hoffman told the State that Occhicone "had a buzz." As to Connell, Occhicone alleges that the State failed to disclose notes of an interview it had with Goddard, Connell's sister, wherein Goddard told the State that Connell had been with Occhicone on the day of the murders. Finally, as to Gerrety, Occhicone claims that the State failed to reveal notes of an interview it had with Gerrety where she stated that on the night of the murders and prior to the shootings, Occhicone had difficulty walking and was staggering, evidence which could have been used to cross-examine her at trial.
Just recently, the United States Supreme Court restated the three components that a defendant must show to successfully assert a Brady violation:
The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.
Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). This prejudice is measured by determining "whether `the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Id. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). In applying these elements, the evidence must be considered in the context of the entire record. See Haliburton v. Singletary, 691 So.2d 466, 470 (Fla. 1997) (quoting Cruse v. State, 588 So.2d 983, 987 (Fla.1991)).
At issue in this claim are notes about possible witnesses. This Court had stated that notes of witness interviews maintained by the State constitute Brady material. See Young v. State, 739 So.2d 553 (Fla.1999) (finding that attorney notes of interviews with State witnesses withheld from the defendant constituted a Brady violation); see also Kyles, 514 U.S. at 446-50, 115 S.Ct. 1555. The court below denied Occhicone's claim based on the materiality prong of the test as well as the fact that the record affirmatively reflects that Occhicone was aware of these witnesses and, more importantly, he knew about the information they would testify to.
Based on the record in this case, we conclude the trial court's summary denial of Occhicone's claims on this issue was proper. In fact, as conceded by Occhicone, these witnesses are allegedly material precisely because they were with him during the hours before the murders. Therefore, no one better than Occhicone *1042 himself could have known about these witnesses. Moreover, in several evaluations conducted by mental health experts appointed in this case, Occhicone stated that he had visited Shooter's Bar the days before the murders and discussed some of the people he had visited with.[4] Therefore, this serves as further proof that Occhicone knew he had visited Shooter's Bar before the murders and was aware of these people. Additionally, some of these witnesses now complained about testified at trial; therefore, Occhicone clearly was aware of them. As noted by the trial court, Occhicone has failed to even allege that he did not know of these witnesses. Although the "due diligence" requirement is absent from the Supreme Court's most recent formulation of the Brady test, it continues to follow that a Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant.
Next, Occhicone alleges that the State knowingly provided false testimony. In support of this claim, Occhicone relies on a sworn affidavit by State witness Lilly Lawson, a barmaid at Shooter's Bar, wherein she states: "There was tremendous pressure put on me by the police pretrial; they made things very difficult for me, and they put words in my mouth. They wanted me to testify a certain way, and they made sure I did so." Additionally, Occhicone alleges that the State failed to disclose a deal it had made with Phil Baker, a "jail-house snitch," and that it remained silent at trial when Baker denied having any understanding with the State. The trial court summarily denied these claims, finding that the testimony of both of these witnesses was not material.
Lawson's most damaging testimony at trial was that a couple of weeks prior to the murders, Occhicone told her that he felt like murdering Gerrety's parents and making her watch. However, as noted by the trial court, Lawson has not alleged that she actually lied or testified falsely at trial as to any particular fact. Moreover, she was not the only witness who testified that Occhicone did not like Gerrety's parents and wished they were not around. Hence, Occhicone has failed to allege that he was prejudiced by the State's alleged misconduct.
Baker testified at trial that while he and Occhicone were together in jail, Occhicone had told him that "the only mistake he made was not killing her [Gerrety] too." Additionally, Occhicone told him "they [Gerrety's parents] were fucking assholes and he should have shot them a long time ago." At the time Baker was contacted by the State, he had four felony convictions, was on parole, and was facing a charge of grand theft. Before Occhicone's trial, Baker received a downward departure sentence to probation instead of jail time on this grand theft charge because of his agreement with the State to testify against Occhicone. On cross-examination at trial, although he testified that he was expecting a favorable recommendation to the parole board, he said that he did not have a specific understanding with the prosecutor for testifying against Occhicone.
Even though the court below recognized that a deal had been made with Baker, it denied Occhicone's claim, finding no reasonable probability that the false testimony affected the jury's judgment. As conceded by Occhicone, Baker's credibility had already been called into question at trial when he testified that he was expecting a favorable recommendation to the parole board, and when it was revealed that he had prior convictions for other crimes involving dishonesty besides the recent grand theft charge. Finally, as noted earlier, *1043 there were several more damaging statements of premeditation made by Occhicone to other witnesses who testified at trial and there was independent evidence of premeditation such as Occhicone cutting the telephone wires of Gerrety's home before entering. Because of these circumstances, we uphold the trial court's ruling.
As his next claim, Occhicone argues that the trial court erred in summarily denying his claim that he was forced to undergo trial while legally incompetent, and that counsel failed to adequately investigate his mental health and failed to provide the experts with relevant and necessary background information. After a review of the record, we affirm the lower court's findings and find that this claim is also conclusively refuted by the record.
The record reflects that three different mental health experts evaluated Occhicone before trial and all three testified that as part of their evaluations, they conducted competency evaluations. Two of these three experts specifically testified that Occhicone was competent to stand trial. Dr. DelBeato, who was court-appointed, testified there was no question in his mind that Occhicone was competent to stand trial. Dr. Fireman, who was appointed by the defense to evaluate Occhicone, also opined that Occhicone was competent to stand trial. Finally, Occhicone does not present any expert who can opine that based on evidence that was not presented to these experts, Occhicone was not competent to stand trial. As such, the trial court correctly ruled that Occhicone's claim on this issue was conclusively refuted by the record.
Finally, Occhicone alleges that the trial court erred in denying portions of his ineffective assistance of counsel claims summarily. Specifically, as to the guilt phase representations, Occhicone alleges that the trial court erred in denying his claims that counsel was ineffective for (1) failing to present evidence of Occhicone's cocaine use; (2) failing to provide the defense experts with sufficient background information; (3) failing to question potential jurors as to a possible taint after a spectator during voir dire made a comment that Occhicone was guilty; and (4) failing to object to a deputy's testimony that Occhicone had refused to submit to an atomic absorption test. In summarily rejecting these claims, the trial court attached relevant portions of the trial record that refute Occhicone's claims. After a review of these portions of the record, we find that the trial court's findings are supported by the record.
In support of this first subclaim, Occhicone alleges that Joanna Carrico had stated that if asked by counsel, she would have testified that Occhicone began using cocaine heavily after Gerrety broke up with him. However, the transcript of the penalty phase reflects that Carrico was specifically questioned about Occhicone's drug use and at that time did not mention any cocaine use by Occhicone. As for counsels' failure to question potential jurors as to a possible taint, the record reflects that defense counsel specifically questioned jurors about the spectator's comments during voir dire.[5] Also, on appeal, this Court addressed the merits of Occhicone's claim concerning his failure to allow his hands to be swabbed for an atomic absorption test and concluded that the issue had no merit.
Finally, Occhicone's claim that defense counsel failed to present experts with background information must fail because none of his experts were called during the guilt phase of the trial, and he does not specifically allege what evidence counsel failed to provide the experts with, nor does he allege that counsel would have otherwise called these witnesses. Moreover, during their penalty-phase testimony the *1044 experts discussed the extensive information that had been provided to them by way of deposition and background. Therefore, we approve the trial court's summary denial of these claims.
As to the penalty phase, Occhicone alleges that counsel were ineffective for failing to provide their experts with sufficient background information, for failing to present evidence regarding Occhicone's personal hardships, for failing to present evidence of Occhicone's cocaine problem, and for failing to request a special jury instruction adequately defining the aggravating circumstances. Again, after reviewing the record and proceedings in this case, we agree that Occhicone's claims on this issue are refuted by the record.
First, Occhicone alleges that if counsel had provided the experts with background information, the experts would not have been as easily attacked on cross-examination. However, each defense expert testified that they relied on numerous depositions and statements to assist them in preparation for testifying at Occhicone's trial. Therefore, even assuming they did not review this information before they evaluated Occhicone, they clearly had reviewed it before they were cross-examined by the State. For example, the record reflects that Dr. Fireman talked to Occhicone's sister before evaluating him and Dr. Szabo read depositions before he interviewed him.
Similarly, Occhicone's claim that defense counsel failed to present evidence of Occhicone's personal hardships is also refuted by the record. The mental health experts testified that Occhicone had emotional problems as a result of Gerrety's decision to abort their baby and their eventual break-up. Moreover, other witnesses, including Occhicone himself, testified about his wife's death due to cancer and his responsibility of having to raise a child by himself. As noted in connection with his claim of ineffective assistance of counsel at the guilt phase, this claim was also properly denied because defense counsel inquired as to Occhicone's prior drug use at trial during Carrico's testimony at the penalty phase. Finally, we find no error with the jury instructions defining the aggravating circumstances; therefore, defense counsel could not have been ineffective, as is now alleged, for failing to request a specific instruction.

EVIDENTIARY HEARING
As noted above, the court below conducted an evidentiary hearing on parts of Occhicone's ineffective assistance of counsel claims concerning both the guilt and penalty phases of the trial. We first address the claim as to counsel's performance during the guilt phase.

Ineffective Assistance of Counsel at Guilt Phase
As previously noted, Occhicone's main defense at trial was that he was voluntarily intoxicated. Occhicone does not question the strategy to present this defense; rather, he disagrees with the particulars regarding how the defense was presented to the jury. At trial, counsel attempted to establish the defense through the cross-examination of State witnesses rather than by separately presenting independent evidence or witnesses on the issue. Trial counsel testified extensively as to this strategy at the hearing below.
In order to prove ineffective assistance of counsel in failing to adequately assert a defense, Occhicone must establish two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
*1045 Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Rutherford v. State, 727 So.2d 216, 219 (Fla.1998); Rose v. State, 675 So.2d 567 (Fla.1996). In Maxwell v. Wainwright, 490 So.2d 927 (Fla.1986), this Court further explained the application of the Strickland standard:
A claim of ineffective assistance of counsel, to be considered meritorious, must include two general components. First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.
Id. at 932 (citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and Downs v. State, 453 So.2d 1102 (Fla.1984)).[6] Ineffective assistance of counsel claims present a mixed question of law and fact subject to plenary review based on the Strickland test. See Stephens v. State, 748 So.2d 1028, 1032 (Fla.1999) (citing Rose v. State, 675 So.2d 567, 571 (Fla.1996)). This requires an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id.
In support of his claim, Occhicone alleges that counsel rendered ineffective assistance at the guilt phase by failing to effectively cross-examine State witnesses Lily Lawson and Cheryl Hoffman; for failing to present the testimony of Patricia Goddard, Kimberly Connel, Michael Stillwagon and Audrey Hall; and for failing to present experts during the guilt phase. Occhicone claims that this evidence would have painted a different picture of Occhicone's intoxicated state on the night of the murders. As we have noted in the past, voluntary intoxication is a recognized defense to premeditated first-degree murder. See Gardner v. State, 480 So.2d 91, 92-93 (Fla.1985). Moreover, evidence elicited during cross-examination of prosecution witnesses may provide sufficient evidence for a jury instruction on voluntary intoxication. See id.
At trial, both Lilly Lawson and Cheryl Hoffman, barmaids at Shooter's Bar, testified as State witnesses to help establish premeditation.[7] Specifically, Ms. Lawson testified that two weeks before the murders, Occhicone had told her that he wanted to shoot Gerrety's parents. Ms. Hoffman also testified that on at least two occasions, Occhicone had told her that he wanted to kill Gerrety's parents. On cross-examination, they admitted that Occhicone was a heavy drinker, but they were not asked about their contact with Occhicone on the day and night of the murders.[8] However, at the postconviction evidentiary hearing, they both testified that Occhicone had been drinking for prolonged periods on the day and night of the murders.
Specifically, Ms. Lawson testified that during her morning shift, she saw Occhicone consume approximately ten shots of schnapps and also drink a vodka and cranberry. She also testified that she saw Occhicone at the bar again at 7:30 p.m. that evening and that Occhicone was again drinking. Finally, at some time prior to 11 p.m. on the night of the murders, she saw Occhicone leaving the bar with a bottle of vodka. Ms. Hoffman, who had the afternoon *1046 shift, testified at the evidentiary hearing that she had served Occhicone alcohol the day of the murder and that she could tell he had been drinking prior to the beginning of her shift.
Occhicone also claims that counsel were ineffective in failing to call Kimberly Connell and Patricia Goddard. At the evidentiary hearing they testified that they had met Occhicone on June 8, two days before the murders, when Occhicone crashed his car into a tree outside of Goddard's house. Although they were contacted by the State, they were never contacted by Occhicone's attorneys or investigators prior to trial. Ms. Connell testified that at the time of the crash, Occhicone smelled of alcohol and that he appeared drunk. She further testified that from the day of the crash until the night of the murders, she had drunk with Occhicone and had smoked marijuana with him. Ms. Connell also maintained that she saw Occhicone at approximately 2:30 a.m. on the morning of June 10, just a short time before the murders, and that Occhicone was intoxicated and was very upset and emotional over his ex-girlfriend, Gerrety. Ms. Goddard testified at the evidentiary hearing that when she first came in contact with Occhicone after the accident, he smelled of alcohol, had slurred speech and had trouble standing. She also testified that she saw Occhicone briefly the day after the accident, that he was very distraught over Gerrety, and that he had a gun.
Occhicone alleges that counsel also erred in failing to present Michael Stillwagon and Audrey Hall as witnesses. At the evidentiary hearing, Stillwagon testified that he saw Occhicone at Shooter's Bar at approximately 6:30 p.m. on June 9 and left with Occhicone that evening in Occhicone's car at approximately 8:30. According to Stillwagon, Occhicone appeared to be intoxicated. As to Hall, Occhicone alleges that she could have testified that Occhicone routinely parked his car at the Artzers' house where it was found on the night of the murders when he would go to visit Gerrety. He claims that this testimony should have been presented to rebut the State's argument that parking his car away from the victim's house on the night of the murder demonstrated his premeditation rather than his routine practice.
As the final category of evidence supporting his ineffective assistance of counsel claim on this issue, Occhicone claims that counsel was ineffective for failing to present experts at trial who had evaluated Occhicone and could have testified that Occhicone did not have the mental state to premeditate the murders. In support of this claim, Occhicone presented Dr. Fireman and Dr. Mussenden at the postconviction evidentiary hearing, both of whom had testified previously during the penalty phase of the trial. Dr. Fireman testified on behalf of the defendant while Dr. Mussenden testified on behalf of the State.
At the evidentiary hearing, Dr. Fireman testified that he was requested by the defense team to provide a mental status examination on Occhicone. He was asked to concentrate on the following areas: (1) competency to stand trial; (2) competency at the time of the offense; and (3) sentencing issues. He testified that Occhicone's trial attorneys never consulted with him about assisting them in preparing the guilt phase of Occhicone's trial, even though they could have utilized his expert testimony in the area of diminished capacity by reason of voluntary intoxication. He also testified that counsel never communicated to him that they were attempting to put on a voluntary intoxication defense during the guilt phase. As to the possible harmful rebuttal testimony of Dr. Mussenden concerning Occhicone's detailed description of the events of the murder, Dr. Fireman testified that he could have aided in impeaching the State's expert since, in his opinion, Dr. Mussenden was inadequately informed about the complexity of the case, the data base he used was unreliable for the conclusions he had, and the presence of other people during Occhicone's evaluation placed a constraint on the reliability of *1047 the information provided by Occhicone. Notwithstanding this testimony, during cross-examination at the evidentiary hearing, Dr. Fireman concluded that although Occhicone had a diminished capacity to premeditate, he did not have an inability to do so. Moreover, during Dr. Fireman's direct examination, he stated that Occhicone had no equivocation under the diminished responsibility by voluntary intoxication.
Dr. Mussenden also testified at the evidentiary hearing. He had testified for the State at the penalty phase of the trial and had opined that Occhicone had the cognitive ability to premeditate. At the evidentiary hearing, he testified that his opinion had now changed in part because of his review of Lawson's and Ann Montana's recent affidavits. He also stated that if he had been aware of these affidavits at the time of trial, he would have testified consistently with the testimony that he was providing at the evidentiary hearing. Moreover, he also conceded that he was not comfortable with the results of his evaluation performed on Occhicone because he had evaluated him in the presence of counsel for the State and the defendant; therefore, Occhicone may not have been completely open with his responses.
At the evidentiary hearing, all three defense attorneys testified extensively concerning their reasons for failing to present the evidence and witnesses now claimed by Occhicone to have been critical. They testified that although they intended to present witnesses at the guilt phase of the trial, they changed their minds after the State had rested because they felt that sufficient evidence of Occhicone's intoxication had been presented during their cross-examination of the State's witnesses to permit them to advance the intoxication defense. Moreover, they all testified that it was important for them to be able to have the first and last word with the jury before deliberations, a right they would lose if they presented evidence independent of the State's case. Attorney LaPorte also testified that, to the best of his knowledge, he was not aware of Patricia Goddard or Kimberly Connell and that he only learned of Stillwagon after the guilt phase and prior to the penalty phase.
As to Hall, defense counsel testified they did not present her as a witness because they had tried to elicit this same testimony in Gerrety's cross-examination. In addition, attorney Young recalled that the State had a witness available to rebut Hall's testimony that Occhicone routinely parked his car at the Artzers' house, which neighbored Gerrety's house. Moreover, attorney Boyer also noted that presenting Hall would have led to testimony concerning Occhicone's pattern of routinely annoying the neighbors when he would drive away loud and fast at about 3 or 4 a.m.
Finally, all three of the defense attorneys testified concerning the reasons for not presenting the additional experts. Boyer testified that his intent and strategy was simply to present sufficient evidence at the guilt phase as to Occhicone's intoxication, without presenting the doctors, and to then use the doctors during the penalty phase only in order to secure more information from their testimony. Young and LaPorte testified that they refrained from presenting any experts during the guilt phase because of the potential harmful rebuttal that could have been presented by Dr. Mussenden concerning Occhicone's vivid recall to him of the details surrounding the murders, a recall inconsistent with heavy intoxication. Moreover, immediately after the State rested its case, the trial court denied Occhicone's motion to exclude and prevent the State from using the taped statements made by Occhicone to Dr. Mussenden during his evaluation. Hence, there was no doubt that the experts could have been cross-examined on these statements. Finally, the attorneys had concluded that there was very little chance of obtaining a verdict of less than first-degree murder, and they consciously decided that they could not credibly and *1048 effectively utilize the doctors at both phases of the trial without diminishing their effectiveness.
Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight...."); Cherry v. State, 659 So.2d 1069, 1073 (Fla.1995) ("The standard is not how present counsel would have proceeded, in hindsight...."). Moreover, strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct. See Rutherford, 727 So.2d at 223; State v. Bolender, 503 So.2d 1247, 1250 (Fla.1987).
In the instant case, all three attorneys testified at the evidentiary hearing that they consciously chose not to present evidence during their case because they believed they had presented enough evidence to the jury through cross-examination, and they felt it was more important to have the first and last word with the jury during closing argument. Moreover, they testified they had intended to present several witnesses, including mental health experts, but finally decided against it when the court denied their motion to prevent the State from introducing the taped statements made to Dr. Mussenden, which in part showed that Occhicone had a good recall of what transpired the night of the murders and therefore was not intoxicated to the level of not being able to premeditate the murders. Further, they believed they could not credibly offer these witnesses at both phases of the trial. Finally, as to witness Audrey Hill, counsel testified that they strategically chose not to present her because the State had a witness available to rebut her testimony, and her testimony would have opened the door for negative evidence of Occhicone's behavior when he would regularly visit Gerrety. Clearly, this testimony suggests a carefully considered and planned defense and provides a proper evidentiary basis for the trial court's ruling denying relief. For these reasons, we affirm the trial court's ruling.
As to the prejudice prong of this claim, the trial court also concluded that presentation of the independent evidence now advanced would not have materially affected the outcome of the trial because it was cumulative to the other substantial evidence of intoxication that was already before the jury: namely that Occhicone was a heavy drinker, that Newell had served him two drinks the night of the murders and that Gerrety had smelled alcohol on him and had stated that he could not stand up straight and staggered when he came to her house the night of the murders. A review of the record supports the trial court's findings, and we find that the trial court's legal conclusions are also supported by our prior decisions.[9]
After a review of the record and the trial court's findings, we find no proper basis for overturning the trial court's conclusion that defense counsel were not deficient nor was Occhicone sufficiently prejudiced by the alleged deficiency to mandate *1049 a new trial. We find no error in the trial court's conclusion that counsel's conduct and decision not to present any independent evidence of Occhicone's intoxication constituted a strategic decision of counsel. If we were to accept Occhicone's challenge to this conduct, we would find ourselves engaging in the hindsight analysis so many courts have warned should not occur when evaluating ineffective assistance of counsel claims. The issue is not what present counsel or this Court might now view as the best strategy, but rather whether the strategy was within the broad range of discretion afforded to counsel actually responsible for the defense. See, e.g., Atkins v. Dugger, 541 So.2d 1165, 1166 (Fla.1989) (finding counsel was not deficient for failing to present expert testimony where the record showed that counsel presented substantial evidence of defendant's intoxication).

Ineffective Assistance of Counsel at Penalty Phase
Occhicone also contends that defense counsel were ineffective at the penalty phase for failing to present the testimony of Ann Montana and Father Ed Lamp as mitigation. Occhicone alleges that Ms. Montana could have testified about Occhicone's relationship with Gerrety and his fragile emotional state after Gerrety left him. Moreover, Father Lamp could have testified concerning the couple's tumultuous relationship and Occhicone's drinking problem.[10]
In order to obtain a reversal of his death sentence on the ground of ineffective assistance of counsel at the penalty phase, Occhicone must show "both (1) that the identified acts or omissions of counsel were deficient, or outside the wide range of professionally competent assistance, and (2) that the deficient performance prejudiced the defense such that, without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different." Rose v. State, 675 So.2d 567, 571 (Fla.1996) (quoting Bolender v. Singletary, 16 F.3d 1547, 1556-57 (11th Cir.1994)); see also Hildwin v. Dugger, 654 So.2d 107, 109 (Fla.1995).
After reviewing the record below, we again find no error in the trial court's conclusion that counsel were not deficient in failing to call these witnesses nor was Occhicone prejudiced by the failure to call them. As far as Ms. Montana is concerned, attorney LaPorte testified at the hearing that defense counsel were aware of her possible testimony at trial, but chose not to present her as a witness because the substance of her testimony had already been provided to the jury through various other witnesses. As to counsel's failure to present Father Lamp, the attorneys testified at the evidentiary hearing that they had contacted all the priests that had been named to them by Occhicone. Therefore, the trial court concluded that counsel conducted a thorough investigation of Occhicone's background and they provided valid reasons for not presenting these witnesses.
Although Ms. Montana's and Father Lamp's testimony would have been admissible as mitigating evidence, the trial court found that when compared to the testimony adduced during the penalty phase and throughout the trial, the evidence would have been cumulative because counsel had already presented evidence of Occhicone's intoxication, habit of heavy drinking, and his distraught state and depression over his relationship with Gerrety. Specifically, Joanne Carrico, a friend of Occhicone's who had known him for about a year at the time of trial, described the "highs and *1050 lows" of Occhicone's relationship with Gerrety after the break-up. She also described Occhicone's reaction to the news that Gerrety had gotten an abortion and testified about how she helped him write a letter to Gerrety asking her to leave him alone and stop calling him if she was not going to stay with him.
Occhicone also presented three doctors at the penalty phase, who testified that Occhicone was under extreme mental and emotional distress and that his ability to appreciate the criminality of his conduct and conform his conduct to the requirements of law was substantially impaired. Finally, Occhicone himself testified during the penalty phase about how his prior wife had died of cancer and how he was the father of a young child.
Again our decisions support the trial court's conclusion that counsel cannot be deemed to have provided ineffective assistance for failing to present this evidence. See Rutherford v. State, 727 So.2d 216, 224-25 (Fla.1998) (stating that counsel was not ineffective for failing to present evidence that was essentially cumulative to the testimony presented by trial counsel at the penalty phase); Routly v. State, 590 So.2d 397, 401-02 (Fla.1991) (denying defendant's ineffective assistance of counsel claim since most of the evidence that defendant claimed should have been presented was already before the judge and jury, except in a different form than originally proffered); Lusk v. State, 498 So.2d 902, 906 (Fla.1986) (finding that evidence concerning defendant's family background was largely cumulative where defendant had already testified about his background and personal problems during the penalty phase).

CONCLUSION
For the foregoing reasons, we affirm the trial court's order in all respects.
It is so ordered.
HARDING, C.J., and SHAW, WELLS, ANSTEAD and LEWIS, JJ., concur.
PARIENTE, J., concurs in result only.
QUINCE, J., recused.
NOTES
[1] The seven issues were as follows: (1) whether the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) whether counsel provided ineffective assistance during the guilt phase; (3) whether counsel provided ineffective assistance during the penalty phase; (4) whether Occhicone was denied a competency evaluation; (5) whether the trial judge provided unreasonably vague and confusing jury instructions; (6) whether the death sentence was based on an unconstitutionally obtained prior conviction; and (7) whether the cumulative impact of judicial error denied Occhicone a fair trial.
[2] In addition to the denial of his specific claims, Occhicone alleges he was denied a fair hearing by the court's refusal to hear three alleged mitigation witnesses and the court's allowing the state attorney to testify.

Occhicone alleges that the trial court erred by preventing him from presenting three witnesses who did not testify at trial and who allegedly could have provided mitigating evidence. At the hearing, the judge ruled that postconviction counsel had failed to lay an adequate predicate for this testimony in that counsel did not allege that trial counsel either knew of these witnesses or should have discovered them through the use of due diligence. We find no abuse of discretion, especially in view of the fact that on appeal, Occhicone has still failed to point to proper allegations as to trial counsel's conduct.
As to this second claim, Occhicone alleges that the court erred in allowing the lead attorney for the State at trial and at the evidentiary hearing, Michael Halkitis, to testify as a rebuttal witness at the evidentiary hearing. At the hearing, Occhicone called Dr. Mussenden to establish that after reviewing affidavits prepared by Lilly Lawson, Joanne Parmenter (Carrico), and Ann Montana during the postconviction process, his opinion on Occhicone's state of mind at the time of the offense had changed in favor of Occhicone. During his testimony, an issue arose as to whose depositions Dr. Mussenden had reviewed prior to his testimony at trial. Although Dr. Mussenden remembered having reviewed certain depositions and that Halkitis had sent him a letter referring him to certain depositions, Dr. Mussenden did not remember exactly whose depositions they were. The evidentiary hearing judge allowed Halkitis to testify as to whose depositions he had sent Dr. Mussenden and relied on part of this testimony in his order denying Occhicone's 3.850 motion for relief.
It is generally understood that under the "advocate-witness" rule, a prosecutor should avoid appearing as both an advocate and a witness except under extraordinary circumstances. See United States v. Hosford, 782 F.2d 936, 938 (11th Cir.1986); see also Shargaa v. State, 102 So.2d 809 (Fla.1958). These extraordinary circumstances usually arise when the evidence is not otherwise available. See United States v. Johnston, 690 F.2d 638, 644-45 (7th Cir.1982). Even under these circumstances, some suggest that counsel should withdraw from further participation in the case. See id.
Although the policy considerations for this rule remain applicable when the prosecutor testifies before a judge instead of a jury, more flexibility may be permitted when it occurs before a judge. See id. at 644. After weighing the circumstances and factors surrounding Halkitis' testimony, we find that the trial judge did not abuse his discretion in allowing Halkitis to testify for this very limited purpose. Because the trier of fact at the evidentiary hearing was the judge, not a jury, we believe any potential prejudice was considerably diminished. Moreover, the transcript reflects that counsel for both the State and Occhicone, as well as the judge, first tried to obtain the actual letter and depositions that were allegedly sent to Dr. Mussenden before allowing him to testify. Finally, because Halkitis did not testify until the end of the evidentiary hearing, it would have created a hardship to the State for him to withdraw as counsel that late in the proceedings. Furthermore, we find that Halkitis' testimony was not of the type that would materially prejudice Occhicone. As noted, Dr. Mussenden himself conceded that he had reviewed several depositions provided by Halkitis before rendering his opinion at trial, but could not remember which depositions.
[3] Claims (5), (6), and (7) raised below are procedurally barred. In claim (5), Occhicone alleges that the penalty phase jury instructions were unreasonably vague and confusing. As noted by the court below, this claim is procedurally barred because claims challenging the validity of jury instructions should be raised on direct appeal, not on motions for postconviction relief. See Buenoano v. Dugger, 559 So.2d 1116, 1118 (Fla.1990); Gorham v. State, 521 So.2d 1067, 1070 (Fla. 1988).

In claim (6), Occhicone alleges that his death sentence was based upon an unconstitutionally obtained prior conviction (resisting arrest with violence). However, Occhicone has not provided any reasons for failing to raise this issue at trial or on direct appeal; therefore, he is procedurally barred from raising the issue now. Further, as noted by the State, a defendant must first collaterally challenge his prior conviction in a separate proceeding before bringing this claim. See Buenoano v. State, 708 So.2d 941, 951-52 (Fla. 1998); Eutzy v. State, 541 So.2d 1143, 1146 (Fla.1989). Occhicone has not challenged this prior conviction nor has he alleged how his conviction for resisting arrest with violence was obtained in violation of his constitutional rights. Finally, this claim also fails on its merits because this aggravating factor could also have been applied solely based on the additional and contemporaneous murder conviction obtained in this case.
Lastly, in claim (7), Occhicone alleges that the cumulative impact of judicial error at trial denied him his right to a fair trial. However, any claim that cumulative errors committed at trial prejudiced the outcome of his case must be raised on direct appeal; therefore, Occhicone is procedurally barred from raising this claim here. See Torres-Arboleda v. Dugger, 636 So.2d 1321, 1323-24 (Fla.1994).
[4] Several witnesses also stated in pretrial depositions that Occhicone frequented this bar and was a heavy drinker. Moreover, Newell stated that she had seen Occhicone at the bar the night of the murders.
[5] Although we noted on direct appeal that "counsel did not so inquire during voir dire," see Occhicone v. State, 570 So.2d 902, 904 (Fla.1990), after a second review of the record, we note that counsel did ask some of the members of the voir dire panel about the spectator's comments.
[6] The U.S. Supreme Court has explained: "The touchstone of an ineffective-assistance claim is the fairness of the adversary proceeding...." Lockhart v. Fretwell, 506 U.S. 364, 370, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).
[7] The defense deposed both of these witnesses before trial.
[8] Because the murders occurred at 4 a.m. on the morning of June 10, we will refer to the events that transpired on June 9, as the day and night of the murders.
[9] See Koon v. Dugger, 619 So.2d 246, 249-50 (Fla.1993) (finding no ineffective assistance of counsel for failing to present voluntary intoxication defense where defense was inconsistent with defendant's detailed testimony and where notwithstanding, counsel had presented evidence that defendant was a chronic alcoholic and was intoxicated at the time of the murder); Routly v. State, 590 So.2d 397, 401 (Fla.1991) (finding defendant did not demonstrate reasonable probability that outcome would have been different because the evidence not presented by counsel was already before the judge and jury, but in a different form); White v. State, 559 So.2d 1097, 1099 (Fla.1990) (rejecting defendant's ineffective assistance of counsel claim for failing to assert the voluntary intoxication defense where counsel testified that such a defense was inconsistent with the deliberateness of defendant's actions).
[10] Occhicone also asserts that counsel were ineffective for failing to provide the mental health experts with information concerning Occhicone's background. This claim is without merit because Occhicone does not allege what information counsel failed to provide to these experts. Moreover, although some of the experts may have evaluated Occhicone and submitted their reports before reviewing outside information and depositions, the record reflects that at the time they testified, they had actually reviewed this information.