# Supreme Court of Florida

_____

No. SC12-246
_____

**JERONE HUNTER,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC14-88
_____

**JERONE HUNTER,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[April 30, 2015]

PER CURIAM.

Jerone Hunter appeals an order of the circuit court denying his motion to vacate his convictions of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of

habeas corpus.  For the reasons that follow, we affirm the denial of his

postconviction motion and deny his habeas petition.[1]

## I. BACKGROUND

On direct appeal, this Court described the facts as follows:

> On August 27, 2004, Hunter was charged in a fourteen-count superseding indictment relating to the murders of Erin Belanger, Roberto Gonzalez, Michelle Nathan, Anthony Vega, Jonathon Gleason, and Francisco Ayo-Roman.  Hunter, with codefendants Troy Victorino and Michael Salas, went to trial on July 5, 2006.  Codefendant Anthony Cannon previously pled guilty as charged.
>
> The evidence at trial established the following.  On the morning of August 6, 2004, a coworker of two of the occupants of a residence on Telford Lane in Deltona, Florida, discovered the victims' bodies.  Belanger lived at the Telford residence with Ayo-Roman, Nathan, and Vega.  Gonzalez and Gleason happened to be at the house the night of the murders.  The six victims had been beaten to death with baseball bats and had sustained cuts to their throats, most of which were determined to have been inflicted postmortem.  Belanger also sustained lacerations through her vagina up to the abdominal cavity of her body; the injuries were consistent with having been inflicted by a baseball bat.  The medical examiner determined that some of the victims had defensive wounds.  A dead Dachshund was also found in the house.
>
> Following a call to 911, law enforcement officers responded to the scene.  The front door had been kicked in, breaking a deadbolt lock and leaving a thirteen-inch shoe-print impression on the door.  The victims were found throughout the house and blood was everywhere.  A knife handle and knife blade were recovered at the scene, along with two playing cards with bloody shoe imprints, a bed sheet with footwear impressions, as well as a pay stub with a footwear impression.
>
> Hunter, who at the time was eighteen years old and in twelfth grade, met codefendant Cannon two months before the murders.  He

---

1.  We have jurisdiction.  See art. V, § 3(b)(1), (9), Fla. Const.

knew codefendant Salas from high school. Hunter met codefendant Victorino during the end of June or beginning of July of 2004, and moved in with Victorino a few days later. Together Hunter and Victorino lived in three different residences, including a house that belonged to victim Belanger's grandmother. No one had permission to stay at Belanger's grandmother's house, but Victorino testified that the owner's grandson had given him permission to stay there.

Approximately a week before the murders, Belanger contacted police concerning suspicious activity at her grandmother's residence. Victorino also reported to police that he had items stolen from the same house. He became angry when the police told him he would have to provide a list of the stolen property. Victorino told the police he would take care of the matter himself. Victorino also met with Belanger at her residence, seeking return of his property.

Brandon Graham, who was living with codefendants Cannon and Salas, met Hunter and Victorino when they went to Belanger's house on Telford Lane a few days before the murders so that Victorino could pick up his belongings. Victorino wanted them to fight the people at the residence. Hunter yelled for the occupants to come out and fight.

On the morning before the murders, Graham, Salas, and Cannon drove to the house where Hunter and Victorino were living. Victorino discussed a plan to beat everyone to death at the Telford residence, asking them if they "were down for it" and saying to Hunter, "I know you're down for it" because he had belongings stolen as well. All agreed. Victorino verbally described the layout of the Telford house and who would go where. Hunter asked if they should wear masks; Victorino said no because they would kill all of the occupants.

A witness testified that around midnight on August 5, 2004, she saw Hunter, Salas, Cannon, and Victorino near the murder scene. And Graham testified that the morning after the murders, he saw Victorino's belongings in the back of Cannon's SUV. On the day after the murders, Victorino was arrested on a probation violation.

In his statement to police, Hunter said that he had gone in Cannon's SUV to the house on Telford on late Saturday or early Sunday to get his belongings that had been taken from Belanger's grandmother's house. He had an aluminum baseball bat with him. Hunter said he entered the house through the front door and found Gleason in the recliner in the living room. Hunter screamed,

"Where's my stuff," and when Gleason said, "I don't know," he hit him with the bat. Hunter hit Gleason because he thought he was lying. Gleason attempted to get up from the recliner and Hunter hit him again. Hunter said he hit Gleason more than three times but less than twelve. Hunter said he then went to look for his belongings. Hunter also indicated that he encountered victim Gonzalez in one of the bedrooms. He claimed he hit Gonzalez because Gonzalez had swung at him with a stick. After Gonzalez dropped his stick, Hunter continued to hit him, three to five more times. Hunter then continued looking for his belongings. Eventually, Hunter and his codefendants left in Cannon's SUV. Hunter, who wore a black shirt, black shorts, and blue and white Nike tennis shoes during the incident, stated that he washed his clothes afterwards.

Cannon's SUV was seized on August 7, 2004. Salas admitted to being at the Telford residence the night of the murder and stated that Cannon had driven them there. Salas described what he had done while in the house and said the bats had been discarded at a retention pond. Based upon that information, law enforcement authorities recovered two bats from the pond and two bats from surrounding trees.

Salas testified about Hunter's involvement in the murders. Salas explained that before the men entered the house on Telford, Hunter called Salas and Cannon "[b******]" because they did not want to take part in the plan. Hunter ran into the house after Victorino. Salas ran in next and saw Hunter swing his bat. Hunter said to Gleason, "I don't like you" and started hitting him. Hunter asked Salas if he had killed Gonzalez; Hunter called Salas a "[p****] boy" when Salas said he was not killing anyone. Hunter then ran into the bedroom and began hitting Gonzalez in the face and head. Hunter hit Gonzalez between twenty and thirty times, saying he had to kill him. Salas left the house. When Hunter came out he described how he found Nathan hiding in one of the bedrooms and killed her when she pled for her life. Salas described Hunter as having a look of "ferule [sic] joy."

Pursuant to a search warrant, numerous items were taken from the house where Hunter and Victorino lived. Among the items taken was a pair of size thirteen boots, a pair of size ten and one-half Nike blue and white tennis shoes without shoe laces, and a pair of shoe laces. These shoes, the laces, and other physical evidence were admitted at trial linking Hunter, Salas, and Victorino to the murders.

Hunter v. State, 8 So. 3d 1052, 1057-59 (Fla. 2008) (footnotes omitted).

Following the penalty phase, "[t]he jury recommended a death sentence for the murder of Gleason by a vote of ten to two, a death sentence for the murder of Gonzalez by a vote of nine to three, a death sentence for the murder of Nathan by a vote of ten to two, a death sentence for the murder of Vega by a vote of nine to three, and life sentences for the murders of Belanger and Ayo-Roman." Id. at 1060-61.  The trial court followed the jury's recommendations, finding that the aggravating circumstances[2] outweighed the mitigating circumstances,[3] and

---

2. "[T]he trial court found the following five aggravating circumstances with their respective assigned weights:  (1) the defendant has been previously convicted of another capital felony or felony involving the use or threat of violence to a person—very substantial weight; (2) the crime for which the defendant is to be sentenced was committed while he was engaged in the commission of the crime of burglary—moderate weight; (3) the crime for which the defendant is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest—moderate weight; (4) the capital felony was especially heinous, atrocious, or cruel—very substantial weight; and (5) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification—great weight." Hunter, 8 So. 3d at 1061.

3. "[T]he trial court found three statutory mitigating circumstances and assigned weights:  (1) age of the defendant at the time of the crime—some weight; (2) the defendant acted under extreme duress or under the substantial domination of another person—some weight; (3) the defendant has no significant history of prior criminal activity—little weight.  The trial court also found three nonstatutory mitigating circumstances:  (1) the level of maturity of the defendant at the time of the crime—little weight; (2) the defendant exhibited good conduct during incarceration—very little weight; and (3) the defendant exhibited good conduct during trial—very little weight." Id.

sentenced Hunter to death for the murders of Jonathon Gleason, Roberto Gonzalez, Michelle Nathan, and Anthony Vega. Id. at 1061.

On direct appeal, this Court affirmed Hunter's convictions and sentences.[4] Id. at 1076. Thereafter, the United States Supreme Court denied Hunter's petition for writ of certiorari. Hunter v. Florida, 556 U.S. 1191 (2009).

On April 14, 2010, Hunter filed a motion for postconviction relief. After summarily denying several claims and after holding an evidentiary hearing on Hunter's claims alleging ineffective assistance of trial counsel during the penalty phase and guilt phase, the postconviction court denied relief. Hunter now appeals

---

4. On direct appeal, Hunter argued that: (1) "the trial court erred in denying his motion to suppress the statements he made to law enforcement officers;" (2) "the trial court erred in denying his motion to suppress the shoe laces seized from his temporary residence;" (3) "the trial court erred in denying his motion for mistrial as his rights under the Sixth Amendment to confrontation and cross-examination were violated when the State's witness, Cannon, the fourth perpetrator, refused to be cross-examined;" (4) "the trial court erred in denying his motion for judgment of acquittal;" (5) "the trial court erred in denying his motion to sever his trial from that of his two codefendants;" (6) there was "instructional error during the guilt phase [because the] use of the conjunction 'and/or' between the defendants' names resulted in reversible error;" (7) "the trial court assigned improper weights to the mitigating factors and improperly balanced the mitigation against the aggravating factors;" (8) "[this Court's] proportionality review is legally insufficient because this Court only considers cases where death has been imposed," and "his death sentence is disproportionate;" (9) "lethal injection, the chemicals used to carry out a death sentence, and Florida's procedures for administering the death penalty are unconstitutional under both the Florida and United States Constitutions;" and (10) "his death sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002)." Id. at 1061-76.

the denial of his postconviction motion.  He also petitions this Court for a writ of

habeas corpus.

## II. POSTCONVICTION MOTION

### A. Ineffective Assistance of Counsel During the Penalty Phase

First, Hunter argues that his trial counsel provided ineffective assistance

during the penalty phase for:  (1) failing to present further nonstatutory mitigation

evidence; (2) failing to develop and present evidence of Hunter's future conduct in

prison as mitigation; and (3) his statement during closing arguments that a majority

vote was required to impose a death sentence.  Because Hunter has failed to

establish the requirements necessary for relief, we affirm the trial court's denial of

relief.

Following the United States Supreme Court's decision in Strickland v.

Washington, 466 U.S. 668 (1984), this Court explained that two requirements must

be met for ineffective assistance of counsel claims to be successful:

> First, the claimant must identify particular acts or omissions of the
> lawyer that are shown to be outside the broad range of reasonably
> competent performance under prevailing professional standards.
> Second, the clear, substantial deficiency shown must further be
> demonstrated to have so affected the fairness and reliability of the
> proceeding that confidence in the outcome is undermined.

Bolin v. State, 41 So. 3d 151, 155 (Fla. 2010) (quoting Maxwell v. Wainwright,

490 So. 2d 927, 932 (Fla. 1986)).

Regarding the deficiency prong of <u>Strickland</u>, there is a strong presumption that trial counsel's performance was not ineffective. <u>Strickland</u>, 466 U.S. at 689. Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Id.</u> The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " <u>Id.</u> (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)).

Regarding the prejudice prong of <u>Strickland</u>, the defendant "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence. To assess that probability, we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [postconviction] proceeding'—and 'reweig[h] it against the evidence in aggravation.' " <u>Porter v. McCollum</u>, 558 U.S. 30, 41 (2009) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 397-98 (2000)); <u>see also</u> <u>Dennis v. State</u>, 109 So. 3d 680, 690 (Fla. 2012) ("[T]he defendant must show that there is a reasonable probability that, 'absent the [deficient performance], the factfinder would have [had] a reasonable doubt respecting guilt.' ") (quoting <u>Strickland</u>, 466 U.S. at 695).

"A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.' " Dennis, 109 So. 3d at 690 (quoting Strickland, 466 U.S. at 694).

Because both prongs of Strickland present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the trial court's factual findings that are supported by competent, substantial evidence, but reviewing the trial court's legal conclusions de novo. See Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).

## 1. Additional Nonstatutory Mitigation

Hunter argues that trial counsel were ineffective for failing to present further nonstatutory mitigation evidence at the penalty phase. Specifically, Hunter asserts that trial counsel should have introduced numerous aspects of Hunter's social history, including Hunter's stressful home environment, his family history of mental illness, and his being kicked out of his family's house prior to the offenses. We affirm the denial of this claim.

First, Hunter has failed to demonstrate deficiency. At the postconviction evidentiary hearing, trial counsel testified that in their case preparation they focused on Hunter's mental health. Trial counsel explained that they met with Hunter's family members a number of times, but they were uncooperative and not willing to admit the family history of mental illness. Additionally, trial counsel testified that they retained an investigator, Odalys Rojas, to interview Hunter's

family members and others and summarize the findings. Trial counsel involved Ms. Rojas in several meetings in efforts to obtain a comprehensive social history on Hunter but did not call her to testify at trial, noting that her testimony may have opened the door for negative testimony about Hunter's aggression. See Everett v. State, 54 So. 3d 464, 474 (Fla. 2010) ("This Court has also consistently held that a trial counsel's decision to not call certain witnesses to testify at trial can be reasonable trial strategy."). Instead, during the penalty phase, trial counsel called three mental health experts, including a psychiatrist, neuropsychologist, and psychologist, to testify to Hunter's mental health and Hunter's family history of mental illness. And "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). Therefore, Hunter has failed to demonstrate deficiency.

Additionally, Hunter has not demonstrated prejudice. During the postconviction hearing, Dr. McClaren testified that Hunter was probably exposed to domestic violence and other negative influence in his family environment that would be traumatic for a child to experience. Further, in a deposition, Dr. Mings discussed his findings of Hunter's mental illness, including Hunter being in the early stages of schizophrenia. However, this additional mitigation evidence Hunter

presented during the postconviction hearing was largely cumulative of the mitigation evidence presented during the penalty phase. For example, Hunter's social history and mental health issues were presented at the penalty phase through the testimonies of Hunter's family members and doctors. The trial record reflects that the family members testified that Hunter mostly kept to himself, carried on conversations with his deceased twin brother, witnessed his father physically abusing his mother, and felt abandoned by his older brother moving out. Additionally, three mental health experts testified during the penalty phase that Hunter suffered from serious mental health issues throughout his life. Specifically, Dr. Berns addressed "Hunter's family's history of mental illness, including schizophrenia and depression." Hunter, 8 So. 3d at 1060. Dr. Mings testified that "[Hunter's] profile was consistent with a person with a psychotic mental illness [and] that Hunter was not functioning as a normal adult." Id. Additionally, Dr. Gur conducted behavior imaging and concluded that Hunter's brain damage and functioning would tend to make him a follower. Id. Therefore, because the additional evidence Hunter claims should have been presented was largely cumulative of the evidence actually presented during the penalty phase, Hunter has not established a reasonable probability of a different result had trial counsel presented this additional evidence during the penalty phase. In other words, our confidence in the outcome is not undermined. See Atwater v. State, 788 So. 2d

223, 234 (Fla. 2001) ("There is no reasonable probability that re-presenting virtually the same evidence through other witnesses would have altered the outcome in any manner.").

Accordingly, we affirm the trial court's denial of relief.

**2. Evidence of Future Conduct in Prison**

Hunter also argues that trial counsel were ineffective for failing to develop and present evidence of Hunter's future conduct in prison as mitigation at the penalty phase. Specifically, Hunter claims that trial counsel should have introduced evidence that Hunter is not a psychopath and conclusions of psychological measures that show Hunter's risk of future violence is lower than the base rate. We affirm the denial of this claim.

First, Hunter has failed to demonstrate deficiency. At the evidentiary hearing, trial counsel testified that their strategy regarding mitigation was to focus on Hunter's mental health issues. And evidence about Hunter's future conduct in prison, including his potential for rehabilitation and nonviolent existence in prison, would have been contradictory to trial counsel's mitigation theory. For example, at the penalty phase, Hunter presented family members and experts who testified to Hunter's mental health issues, including schizophrenia and a profile consistent with a person with a psychotic mental illness. See Hunter, 8 So. 3d at 1060. In contrast, during the postconviction proceeding, Dr. Brown and Dr. McClaren

- 12 -

agreed with the conclusion that Hunter is not a psychopath. Therefore, because it appeared to contradict the mental health testimony, trial counsel's decision not to present evidence about Hunter's future conduct in prison and that his risk of future violence was lower than the base rate appears to have been a reasonable strategic decision. See Occhicone, 768 So. 2d at 1048 ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.").

Additionally, Hunter has not demonstrated prejudice. While Hunter presented evidence of future conduct in prison in the postconviction proceeding, evidence was also presented that the findings were based on speculation. Moreover, even considering future conduct in prison with the other mitigation evidence presented during the postconviction proceeding, as well as the mitigation presented at the penalty phase, the mitigating circumstances would not outweigh the five aggravating circumstances presented in this case, namely conviction of a capital felony, during the course of a burglary, for the purpose of avoiding or preventing a lawful arrest, HAC, and CCP. See Tanzi v. State, 94 So. 3d 482, 491 (Fla. 2012) ("The mitigating evidence adduced at the evidentiary hearing combined with the mitigating evidence presented at the penalty phase would not outweigh the evidence in aggravation as this case included six aggravating circumstances given

great and utmost weight."). Therefore, there is not a reasonable probability that investigating and presenting evidence of Hunter's future conduct in prison would have led to a different result. In other words, our confidence in the outcome is not undermined.

Accordingly, we affirm the trial court's denial of relief.

**3. Trial Counsel's Statement About the Majority Vote**

Further, Hunter argues that trial counsel was ineffective for his statement during closing arguments that a majority vote was required to impose a death sentence. However, we affirm the denial of this claim.

Even assuming that trial counsel was deficient for his statement during closing arguments, Hunter has failed to demonstrate prejudice. In the jury instructions, the trial court correctly advised the jury of the vote required for the advisory sentence. Notably, the votes for each of the four victims to impose the death penalty were beyond the majority vote stated. Therefore, there is not a reasonable probability that, absent trial counsel's statement during closing arguments, that there would have been a different result. In other words, confidence in the outcome is not undermined.

Accordingly, we affirm the trial court's denial of Hunter's claim that trial counsel were ineffective during the penalty phase.

**B. Ineffective Assistance of Counsel During the Guilt Phase**

Next, Hunter argues that trial counsel were ineffective during the guilt phase for failing to properly preserve his objection and move for a mistrial regarding Robert Anthony Cannon's testimony. However, Hunter did not demonstrate that he was prejudiced by trial counsel's alleged error.

Cannon, the fourth perpetrator, negotiated a plea deal in exchange for agreeing to testify at the joint trial of the other three defendants, including Hunter. On direct appeal, this Court denied Hunter's claim "that the trial court erred in denying his motion for mistrial as his rights under the Sixth Amendment to confrontation and cross-examination were violated when the State's witness, Cannon, the fourth perpetrator, refused to be cross-examined." Hunter, 8 So. 3d at 1065.

In a codefendant's case, Victorino v. State, 127 So. 3d 478, 488 (Fla. 2013), where the same issue was raised regarding Cannon's testimony, this Court found that Victorino was not prejudiced by trial counsel's error in failing to preserve alleged error and to move for a mistrial at the time of Cannon's testimony. Similarly, in this case, we affirm the denial of Hunter's claim.

Hunter has not demonstrated that Cannon's testimony was so harmful as to merit a mistrial. In fact, Cannon's testimony and refusal to answer questions did not vitiate Hunter's trial. See England v. State, 940 So. 2d 389, 401-02 (Fla. 2006) ("A motion for a mistrial should only be granted when an error is so prejudicial as

- 15 -

to vitiate the entire trial."). Cannon's comments regarding Hunter were brief and unelaborated. Specifically, on direct examination, Cannon's testimony regarding Hunter was the following: (1) Cannon knew Hunter for a couple days prior to the crimes, and (2) Victorino, Hunter, Salas, and Cannon entered the home armed with baseball bats. Therefore, similar to what we concluded in Victorino, Cannon's testimony mentioning Hunter did not vitiate Hunter's trial. Victorino, 127 So. 3d at 489 ("[O]nly a few lines of testimony were harmful to Victorino . . . As a result, Cannon's testimony was not essential to the State's case against Victorino.").

Further, the incriminating points made in Cannon's testimony regarding Hunter were established by other evidence. Specifically, in his statement to police, Hunter stated that on the night of the offenses, he went to the Telford home to get his belongings, and he had an aluminum baseball bat with him. Hunter, 8 So. 3d at 1058. Hunter further stated that he hit victims Gleason and Gonzalez several times with the bat. Id. Additionally, "Salas testified about Hunter's involvement in the murders," that "Hunter ran into the house after Victorino[, and] Salas ran in next and saw Hunter swing his bat." Id. at 1059. Cannon's testimony was cumulative and merely "lent further support to . . . fact[s] already known to the jury." Cherry v. State, 781 So. 2d 1040, 1051 (Fla. 2000). Therefore, Hunter was not prejudiced by trial counsel's error. See Victorino, 127 So. 3d at 490 ("[T]he incriminating portions of Cannon's testimony were substantially cumulative to other evidence

presented at trial. A defendant is not prejudiced by the improper admission of evidence if the evidence is merely cumulative.").

Accordingly, this Court affirms the trial court's denial of Hunter's claim that trial counsel were ineffective during the guilt phase.

## C. Other Issues

Hunter also raises four constitutional challenges, all of which do not entitle him to relief: (1) rule 4-3.5(d)(4) of the Rules Regulating the Florida Bar is unconstitutional; (2) the trial court unconstitutionally instructed the jury that its role was advisory; (3) Florida's capital sentencing scheme violates due process and constitutes cruel and unusual punishment on its face and as applied to him because Florida's death penalty statute does not ensure that defendants are not sentenced to death in an arbitrary and capricious manner; and (4) his sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002). These claims are procedurally barred because they should have been or were raised on direct appeal.[5] See Dennis, 109 So. 3d at 698; Lukehart v. State, 70 So. 3d 503, 521-22 (Fla. 2011); Troy v. State, 57 So. 3d 828, 842-44 (Fla. 2011). Therefore, this Court affirms the denial of each of these claims.

---

5. On direct appeal, Hunter raised the claims that the lethal injection protocol and Florida's procedures for administering the death penalty are unconstitutional and that his sentence violated Ring, and this Court found that Hunter is not entitled to relief. Hunter, 8 So. 3d at 1075-76.

**D. Cumulative Error**

Hunter also argues that he was denied a fundamentally fair trial based on cumulative error. "However, where the individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error also necessarily fails." Israel v. State, 985 So. 2d 510, 520 (Fla. 2008) (quoting Parker v. State, 904 So. 2d 370, 380 (Fla. 2005)). As discussed in the analysis of the individual issues above, the alleged errors are either procedurally barred or without merit. Therefore, the cumulative error claim is similarly without merit, and we affirm the denial of this claim.

**III. HABEAS PETITION**

In his habeas petition, Hunter contends that Florida's death penalty statute violates the Eighth Amendment's evolving standards of decency because most states require a unanimous jury verdict to recommend a death sentence. However, this Court recently reviewed and rejected this same argument in Kimbrough v. State, 125 So. 3d 752, 753 (Fla. 2013). As we explained in Kimbrough, Hunter's claim "is subject to our general jurisprudence that non-unanimous jury recommendations to impose the sentence of death are not unconstitutional." Kimbrough, 125 So. 3d at 754 (quoting Mann v. State, 112 So. 3d 1158, 1162 (Fla. 2013)); see also Parker, 904 So. 2d at 383 ("This Court has repeatedly held that it

is not unconstitutional for a jury to recommend death on a simple majority vote.").

Accordingly, we deny relief.

## IV. CONCLUSION

For the forgoing reasons, we affirm the denial of Hunter's postconviction motion and deny his habeas petition.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Two Cases:

An Appeal from the Circuit Court in and for Volusia County,
        William A. Parsons, Judge - Case No. 642004CF001380XXXAWS
And an Original Proceeding – Habeas Corpus

James Vincent Viggiano, Jr., Capital Collateral Regional Counsel, Middle Region, and Ann Marie Mirialakis, Assistant-Capital Collateral Regional Counsel, Middle Region, Tampa, Florida,

        for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and James Donald Riecks, Assistant Attorney General, Daytona Beach, Florida,

        for Appellee/Respondent