18 So.3d 473 (2009)
Curtis W. BEASLEY, Appellant,
v.
STATE of Florida, Appellee.
No. SC06-2375.
Supreme Court of Florida.
July 9, 2009.
Rehearing Denied September 23, 2009.
*478 Daniel F. Daly of Daly, Mills and Potts, P.A., Tampa, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Carol M. Dittmar, Senior Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Curtis W. Beasley appeals an order of the Circuit Court of the Tenth Judicial Circuit denying his amended motion to vacate a judgment of conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.851. Under our mandatory jurisdiction to review final orders arising from capital proceedings, we affirm the circuit court's order. See art. V, § 3(b)(1), Fla. Const.

PROCEEDINGS TO DATE
In 1998, Beasley was convicted of the first-degree murder of Carolyn Monfort and the contemporaneous offenses of robbery and grand theft. He received a death sentence for the murder and concurrent sentences of fifteen years' imprisonment for the robbery and five years' imprisonment for the grand theft. In the direct appeal of these convictions, we summarized the facts of the crimes as follows:
On August 24, 1995, Jane O'Toole, who had not heard from her mother, Mrs. Monfort, for two days, traveled to her mother's home in Dundee, Florida. . . [and] found her mother's body in the blood-stained laundry room. Mrs. Monfort had been severely beaten and was dead.
The last time that Jane spoke to her mother was on August 21, 1995. On that day, Mrs. Monfort, who worked in real estate, had dressed in business clothes in anticipation of her Monday morning meeting. . . . Beasley was staying at Mrs. Monfort's house for a few days, while doing some [work] at the Lake Marie Apartments . . . [, which] were owned by Mrs. Monfort's son-in-law. . . and managed by Mrs. Monfort.
. . . [Beasley] had recently been staying as a guest in the Monfort home, so that Mrs. Monfort could drive Beasley to and from work at the apartments. . . . [O]n Sunday, August 20, Officer Pierson. . . saw Beasley at Steve Benson's house, wearing a checkered "western-style" shirt during the day. However, Beasley apparently spent the night of *479 the 20th at the Monfort home, because he was there at 8 a.m. the next morning, when the housekeeper, Mrs. Ferguson, came to clean the house. While cleaning that day, the housekeeper saw a checkered shirt lying on a wicker chest at the foot of the bed in the guest bedroom, which Beasley was using.
. . . .
. . . [A]fter Mrs. Monfort had transported Beasley to the apartments on the 21st, she . . . met with Mr. Rosario, a prospective tenant at the apartments [at 5 p.m]. He gave her [$900 in cash]. . . . She left the apartments sometime between 5:30 and 5:45 p.m. That was the last time Mrs. Monfort was seen until the discovery of her body on August 24.
. . . .
Sometime between 8:30 and 10 p.m. that night, Beasley drove Mrs. Monfort's car to Haines City to visit Dale Robinson. . . . During the visit, Beasley showed Robinson a $100 bill, offering it in partial payment of his debt. After Robinson suggested to Beasley that the money should be used to purchase some crack cocaine for them to smoke, Beasley left Robinson's house and did not return.
The next day, Beasley arrived at a bus station in Miami. He no longer had Mrs. Monfort's car with him,[n.1] and, at this point, he called the Malcolms, whom he had not contacted in over three and a half years. . . . He told Mrs. Malcolm that he was vacationing in Miami after having visited unidentified friends in Fort Myers. He stayed with Mrs. Malcolm for a few days, then was permitted to stay at the house of Mr. Malcolm's mother. . . .
[N. 1.] After Beasley had been taken into custody, Mrs. Monfort's car was eventually found in a parking lot at a Howard Johnson Hotel in Orlando, approximately two and a half miles from the bus station, and within two miles of three different locations to which telephone calls had been made from the Monfort home on August 21. The relevant telephone numbers belonged to persons known to Beasley. . . but not known to Mrs. Monfort. The officer who responded to the call from Howard Johnson's was told that the vehicle had been there approximately two weeks. . . . [T]he odometer reflected that it had been driven very few miles since an oil change that had occurred on a date prior to Mrs. Monfort's death. The car's license plate had expired three months earlier, the doors and trunk were locked, and there was no evidence that anyone other than Mrs. Monfort and Beasley (whose cigarette butts were in the car) had been inside it.
. . . .
. . . The cause of death, in the medical examiner's opinion, was blunt trauma to the head; while a hammer could have caused the injuries, the impact pattern did not suggest whether the head or the claw end had been used.
After Mrs. Monfort's body was discovered, an investigation of the crime scene was conducted. The only rooms which appeared to have been disturbed were the dining room, the utility (or laundry) room, and the garage. The investigators testified that they did not look under the beds in either the master bedroom or the guest room. All of the beds were made, and the master bed had folded linens on it, suggesting that no one had slept in the house after the housekeeper had cleaned. Photographs of the interior of the home demonstrated that, other than the three disturbed areas, the remainder of the home appeared to be in impeccable order. The *480 garage door was closed, and Mrs. Monfort's car was missing. The [cash] Rosario had given to Mrs. Monfort w[as] gone.
. . . .
While the crime scene was being investigated, the home was secured, and members of Mrs. Monfort's family were not permitted to enter the house. The family members left the house at the end of the day, after the crime scene was released, but before the investigation team had completed work. Before they left, the lead detective (Detective Cash) asked family members to return to the house the next day, to attempt to identify any missing valuables. They agreed to call Detective Cash after they arrived, so that she could join them at the home.
The next day, [Mrs. Monfort's family] went to the Monfort home. . . . In the guest bedroom, [her son] . . . lowered himself to the floor to look under the bed [and] observed a pair of shoes placed neatly together, with a wadded-up shirt next to the shoes.
Detective Cash had already been contacted, and no one touched either the shoes or the shirt until she arrived at the Monfort home and was advised of the discovery. . . . Detective Cash and her partner went immediately into the guest room, where she reached under the bed and retrieved the shirt. She obtained a bag from her car, and when she unfolded the shirt on the bag, she discovered apparent blood on the shirt. Detective Cash then placed the shirt in the bag, and the bag in the trunk of her car.
Subsequent DNA testing on the blood taken from the shirt showed that all parameters tested were consistent (none were inconsistent) with Mrs. Monfort's blood. The testing excluded Beasley as a donor of the blood. The housekeeper identified a picture of the shirt as being the same pattern (but a little lighter) as the shirt which she had seen in the guest bedroom where other items belonging to Beasley were located on the morning of August 21. Officer Pierson identified the shirt as being the same shirt Beasley had worn when he saw him at Benson's house on August 20.
A search for Beasley was initiated from central Florida [and] Beasley was eventually found in Alabama. . . .
. . . The jury convicted Beasley of all three charges. Following the penalty phase of the trial, the jury recommended death by a vote of ten to two. The trial court followed the jury's recommendation, sentencing Beasley to death for the homicide, and to concurrent terms of fifteen years and five years of imprisonment, respectively, for the robbery and grand theft convictions.
Beasley v. State, 774 So.2d 649, 653-57 (Fla.2000) (some footnotes omitted).[1]
*481 Beasley appealed his convictions and sentences to this Court. We denied relief with regard to all issues[2] and affirmed Beasley's convictions and sentences. See Beasley, 774 So.2d at 675. On January 17, 2002, Beasley filed a timely rule 3.851 motion to vacate judgment of convictions and sentences. See Fla. R.Crim. P. 3.851(d)(1)(A). Through several amended motions, Beasley raised the following issues before the postconviction court: Claim OneIneffective assistance of counsel during the guilt phase of trial for failing to adequately investigate persons disclosed by discovery, failing to assert proper objections, and failing to otherwise adequately test the State's case; Claim TwoIneffective assistance of counsel during the penalty phase of trial for failing to adequately investigate and prepare additional mitigating evidence, failing to present adequate evidence in support of mitigating circumstances raised, and failing to challenge the State's case; Claim ThreeImproper jury contact denied Beasley the constitutional protection that all communications with the jury would be conducted in Beasley's presence; Claim FourFlorida's lethal-injection protocol is unconstitutional; Claim FiveFlorida's capital-sentencing statute is unconstitutional on its face and as applied for failing to prevent the arbitrary and capricious imposition of the death penalty; and Claim SixCumulative error by counsel deprived Beasley of a fair trial.
The postconviction court held an evidentiary hearing on claims one through three, during which Beasley's trial counsel were the sole witnesses. Subsequently, the postconviction court issued a written order denying relief on all claims. Beasley appealed the order to this Court, challenging the denials of claims one through three and waiving any issues of error with regard to the denial of claims four through six.[3]

*482 ANALYSIS
Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for claims of ineffective assistance of counsel to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted). The defendant must establish that "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment," and that there is a reasonable probability that, but for this deficiency, the result of the proceeding would have been different. Strickland, 466 U.S. at 687, 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687, 104 S.Ct. 2052.
Generally, this Court employs a mixed standard of review with regard to an order denying a postconviction claim after an evidentiary hearing. Each prong of the Strickland test presents mixed questions of law and fact. Therefore, we accord deference to the postconviction court's factual findings if supported by competent, substantial evidence, and review the legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004). There is a strong presumption that trial counsel's performance was effective. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective *483 at the time." Id. at 689, 104 S.Ct. 2052. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Thus, "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000).

The Bloody Shirt

Failure to Consult Experts in Forensic Crime Scene Investigation or Blood Spatter
Beasley maintains that he received ineffective assistance of counsel for the failure to consult with, and present the testimony of, expert witnesses in the areas of forensic crime scene investigation or blood spatter to support the defense theory that the bloody shirt had been planted after the crime scene technicians released the scene to the family. Beasley asserts that the omission of expert testimony prevented the jury from considering evidence on proper crime scene procedures and whether the actual killer could have worn the shirt during the murder and later placed it under the bed. According to Beasley, if counsel had presented expert testimony on the thoroughness of the crime scene investigation and on the likelihood that blood would have dripped from the shirt onto the white carpet when the assailant placed the shirt under the bed, the crucial evidence of the bloody shirt would have been compromised and the outcome of the trial would have been different.[4] Beasley did not present independent evidence to establish this assertion and relied solely on the cross-examination of trial counsel and the argument of postconviction counsel.
In denying this claim, the postconviction court ruled that there was no deficient performance because counsel testified that the defense effectively advanced the theory that the crime scene technicians either neglected to examine under the bed during their initial investigation or that the bloody shirt was placed there after the initial investigation concluded. In finding that defense counsel's strategy was not deficient, the postconviction court could only review the testimony of trial counsel with regard to their performance because Beasley did not present any other witnesses.
The evidence presented revealed that the defense strategy was to use effective cross-examination to challenge the legitimacy of the theory that Beasley placed the shirt under the bed after he murdered Mrs. Monfort. Through this cross-examination, defense counsel sought to advance the theory that the shirt had been planted after the fact because the crime scene technicians performed a thorough investigation, which included a search under the bed, and the assailant could not have placed the bloody shirt underneath the bed after the murder without leaving evidence of blood on the white carpet. Trial counsel testified that there were methods available to prove this theory: (1) attack the investigators for their failure to conduct a proper *484 investigation and thus missing the shirt; or (2) establish that the investigators did conduct a thorough investigation and that the shirt was absent because it was planted after the initial search. The defense team opted to follow the latter strategy because it would have been unusual for a ten-hour investigation to overlook a bloody shirt under a bed in a room that the defendant inhabited, especially when one of the technicians knelt at the foot of the bed to collect a small piece of copper wire from the floor within visual range of the shirt. Defense counsel relied on the cross-examination of law enforcement officers and crime scene technicians to advance this theory.
Moreover, trial counsel testified that they concluded that an expert was not needed because the impeachment of the officers and the crime scene team was effective:
We made a major issue out of that faux pas. That is one of the most suspicious circumstances I personally have ever seen in a murder investigation. . . . [When the defense] cross-examined Detective Cash about it[,] . . . we lit into her and we brought those points out on cross-examination in no uncertain terms. . . . [M]y memory of it is that it was so obvious to us that I don't know that I even thought about the advisability of having an expert. I mean, we have pristine white carpet and a shirt with considerable amounts of blood on it. We have a laundry room where the blood is literally all over all four walls. And this person is supposed to have gone into the bedroom and taken the shirt off and not left a drop of blood. . . . [T]hat's beyond the range of believability, in my opinion. So I don't know that I ever really thought much about [hiring an expert].
There was testimony during a deposition that the cross-examination left the crime scene technicians "with egg on their face[s]." One investigator was distressed after the cross-examination, and trial counsel did not believe that an expert was needed to explain that law enforcement botched the investigation because this conclusion was "self-evident." Thus, defense counsel had a reasonable strategy for not presenting an expert witness. See Darling v. State, 966 So.2d 366, 378 (Fla.2007) (stating that trial counsel is not ineffective for failing to present cumulative evidence).
To establish ineffective assistance, Beasley must also demonstrate prejudice from counsel's alleged deficient performance. During the postconviction hearing, Beasley presented no witness or other material to demonstrate what further evidence was available to the defense or what should have been presented during trial. In essence, postconviction counsel here has utilized the same strategy as trial counsel to address this claim: inference developed through argument and cross-examination. Absent any evidence of what an expert could and would have presented, other than postconviction counsel's argument, Beasley has not established a reasonable probability that the testimony of either type of expert during his capital trial would have impacted the original trial in a manner that would undermine our confidence in the verdict. Based on the presentation to the postconviction court, which consisted solely of trial counsel's testimony and the argument of postconviction counsel, there was no evidence that an expert would have provided different information during Beasley's capital trial. Thus, we deny relief on this claim because Beasley has failed to satisfy either the deficient performance or prejudice prongs of Strickland.

*485 Failure to Challenge the Admission of the Bloody Shirt

Beasley next maintains that counsel should have attempted to exclude the bloody shirt based on a break in the evidentiary chain of custody. The postconviction court denied this claim because Beasley did not present any evidence that the shirt or any other evidence collected was tampered with after law enforcement obtained custody of the evidence, despite a small delay in placing the evidence in the property room. Without evidence of tampering, the postconviction court did not find a basis to exclude the shirt because of an alleged break in the chain of custody. During the postconviction hearing, trial counsel testified that his strategic analysis determined that it was the weight of the evidence that was at issue during trial, not the admissibility of the evidence.
Where counsel has a reasonable basis to believe that pursuing certain lines of defense would be fruitless, counsel does not act unreasonably in not pursuing them. See Reed v. State, 875 So.2d 415, 432 (Fla. 2004). A motion to exclude the shirt based on a break in the chain of custody required specific allegations of probable tampering. See Bernard v. State, 275 So.2d 34, 35 (Fla. 3d DCA 1973). Trial counsel testified that there was no indication of tampering, and the defense team did not believe that they possessed a basis to exclude the shirt. Postconviction counsel has alluded to a discrepancy between when the shirt was collected and the time that the evidence log reflected the shirt was placed in the evidence locker. However, postconviction counsel did not produce the log as evidence to demonstrate this discrepancy. Postconviction counsel also did not request DNA testing under Florida Rule of Criminal Procedure 3.853 to demonstrate a different basis for exclusion. Hypothetically, it may be possible that tampering occurred and there may have been a break in the chain of custody; however, the postconviction record does not support either factor other than postconviction counsel's speculative argument.
Beasley also asserted that counsel was ineffective for failing to hire a DNA expert to test the shirt and to provide confirmation that the DNA evidence was contaminated. Trial counsel testified that the defense team did not consider hiring a DNA expert, but in retrospect, would not have done so because it may have revealed that only Beasley and the victim's DNA were on the shirt. It may have been helpful if a DNA analysis had produced another suspect, but Beasley admitted that the shirt belonged to him. Therefore, the risk was great that a DNA test would have provided further support for the State's case. Cf. Reed, 875 So.2d at 432. Without evidence to support Beasley's postconviction claim, the record does not demonstrate that counsel was ineffective for failing to file a motion to exclude the shirt.

Cross-examination of Witnesses With Regard to the Bloody Shirt
Beasley attacked counsel's cross-examination of witnesses with regard to the bloody shirt on the basis that the tactic of making inferential arguments from the testimony failed to aggressively confront the evidence. In denying this claim, the postconviction court emphasized that the evidence demonstrated that the defense vigorously interrogated law enforcement witnesses with all necessary questions and that the cross-examination of one of the lead officers was effective in showing the ineptness of the investigation.
A review of the transcript of the trial proceedings comports with the findings of the postconviction court. The cross-examination of the crime scene technicians raised issues concerning the crime scene *486 procedures utilized and the discovery of the bloody shirt. Counsel attempted to demonstrate that the shirt was planted by emphasizing that the crime scene technicians conducted a thorough investigation. The cross-examination established that the primary crime scene technician had worked in the crime scene unit for twelve years and possessed extensive training and experience. Pursuant to vigorous questioning, the technician explained the importance of the policy that required a crime scene technician to precisely document each process undertaken at the scene, and admitted that the failure to locate the shirt during the initial investigation was embarrassing. The cross-examination fully presented the investigation of the guest bedroom, from the photographs taken by the technicians to the evidence that they collected. During this extensive and aggressive cross-examination, the State actually objected on the basis that the defense questioning implied that the bloody shirt was planted. Thus, the cross-examination was sufficiently effective to create a question of whether the shirt had been planted to the extent it sparked an objection by the State regarding that very implication.
Beasley did not present additional areas that defense counsel should have covered during cross-examination. Without additional evidence to refute defense counsel's strategic explanations for the manner in which he attacked the bloody shirt, Beasley has not demonstrated either deficient performance in the cross-examination or that there is a reasonable probability that more aggressive cross-examination would have impacted this case in a manner which undermines our confidence in the outcome. Therefore, we affirm the postconviction court's denial of each of Beasley's subclaims pertaining to the bloody shirt.

The Missing Voicemail Message
Beasley alleges that he informed trial counsel that he made a telephone call to the victim within days after the murder and left a voicemail message. He urges that this voicemail may have contained exculpatory or impeaching information which could have demonstrated that he was innocent because he was unaware of the murder and believed that Mrs. Monfort was still alive. By not litigating the possibility of an exculpatory tape, Beasley contends that counsel was deficient because they failed to develop a record concerning the tape or to pursue further support for his claim of innocence. Therefore, according to Beasley, counsel rendered ineffective assistance by failing to investigate and address this voicemail issue.
In rejecting the claims with regard to counsel's investigation, the postconviction court specifically noted that there was no evidence of any bad-faith destruction of evidence by the State to support a motion attacking the prosecution based on the undisclosed voicemail message. We evaluate the trial court's factual findings with regard to the performance of counsel for competent, substantial evidence and consider de novo whether counsel made reasonable tactical decisions concerning investigation of the voicemail.
The United States Supreme Court has considered several standards concerning the constitutionally guaranteed right of access to evidence. See United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Each focuses on the type of violation asserted and the impact of the evidence on the defendant's case. For example, in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the Supreme Court explained:
In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), we *487 held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id., at 87, 83 S.Ct. 1194. In United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), we held that the prosecution had a duty to disclose some evidence of this description even though no requests were made for it, but at the same time we rejected the notion that a "prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel." Id., at 111, 96 S.Ct. 2392; see also Moore v. Illinois, 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case").
Youngblood, 488 U.S. at 55, 109 S.Ct. 333. Furthermore, to establish a Brady violation, the defendant has the burden to show (1) that favorable evidenceeither exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) that because the evidence was material, the defendant was prejudiced. See Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Way v. State, 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate a reasonable probability that, had the suppressed evidence been disclosed, the jury would have reached a different verdict. See Strickler, 527 U.S. at 289, 119 S.Ct. 1936. A reasonable probability is a probability sufficient to undermine our confidence in the outcome. See Way, 760 So.2d at 913; see also Strickler, 527 U.S. at 290, 119 S.Ct. 1936.
Thus, whether the good or bad faith of the State is relevant to an analysis of an alleged due process violation depends on the type of error asserted and whether the evidence is exculpatory, impeaching, or merely potentially useful. Exculpatory evidence has been defined as that "tending to establish a criminal defendant's innocence." Black's Law Dictionary 597 (8th ed.2004). Impeachment evidence refers to that which is "used to undermine a witness's credibility." Id. at 768. When evaluating the suppression of evidence alleged to be exculpatory, there is no requirement for a showing of bad faith for a determination of a violation under Brady. See Youngblood, 488 U.S. at 57, 109 S.Ct. 333 ("The Due Process Clause of the Fourteenth Amendment, as interpreted in Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence."). For circumstances in which the State failed to preserve evidence that is merely potentially useful, however, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at 58, 109 S.Ct. 333.
The determination by trial counsel that the evidence was actually just "potentially useful," and not exculpatory, is reasonable. Although the voicemail may have been argued to support Beasley's defense that he left town to visit friends in Miami and that he was unaware of the murder, the voicemail does not in any way eliminate Beasley as the person who committed the offense. The alleged voicemail was created by Beasley after the murder and could reasonably be cast as a self-serving creation. Thus, it is reasonable to conclude that the allegedly withheld evidence was not direct or exculpatory evidence under Brady or Youngblood and therefore the defense would have been required to demonstrate *488 that the State withheld, destroyed, or failed to preserve the voicemail in bad faith.
Beasley also failed to demonstrate the basic foundation of this claimthat the voicemail even existed. Beasley did not testify that he left the message or introduce the phone records or the documentation of the evidence collected by the State during discovery. Beasley not only failed to establish that the "missing" voicemail existed, he presented nothing more than speculative argument with regard to the content of the voicemail, which is an essential element in determining whether a due process violation occurred for both a Brady and a Youngblood claim. Beasley also did not present any evidence to support his claim that the State possessed the voicemail, which is an obvious prerequisite to demonstrating that the voicemail was withheld or destroyed, regardless of intent. Without establishing that the voicemail existed and was possessed by the State, Beasley could only speculate through argument and cross-examination with regard to the State's alleged "bad faith" destruction or suppression of the voicemail.
The testimony of defense counsel refuted Beasley's speculative claims. Trial counsel acknowledged that a Youngblood motion would have been appropriate if the voicemail had never been disclosed and the State had possessed evidence of it. This, however, was a hypothetical answer to a question posited by postconviction counsel. Counsel testified that the issue of an alleged missing voicemail was not litigated because it could not be demonstrated that the State had lost or destroyed the alleged voicemail in bad faith. Under the Youngblood analysis, this was a reasonable strategy for defense counsel. Thus, we affirm the order with regard to this claim because Beasley has not demonstrated either deficient performance or that there is a reasonable probability that litigating the missing voicemail would have impacted the verdict.

Alibi Timeline
Throughout the capital trial, Beasley maintained that he was innocent because on the day that murder was committed, he left Dundee on a trip to Miami. Defense counsel investigated the stops along Beasley's travel route to establish the timeline for his alibi. However, trial counsel was unable to recover any evidentiary proof of Beasley's trip. In his postconviction motion, Beasley contends that had counsel promptly investigated the route or established a general timeline, the defense could have presented a verified alibi to the jury, which would have a reasonable probability of changing the outcome of the trial. For each of these alleged errors, Beasley has not demonstrated deficient performance or prejudice.
The postconviction court rejected this claim because the testimony of trial counsel established that the efforts to investigate were reasonable and diligent. In Strickland, the United States Supreme Court addressed defense counsel's duty to investigate:
[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, *489 what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.
466 U.S. at 691, 104 S.Ct. 2052 (emphasis supplied). Trial counsel is not absolutely required to hire special investigators under all circumstances; trial counsel is only required to conduct a reasonable investigation. See Davis v. State, 928 So.2d 1089, 1117 (Fla.2005).
With regard to the first alleged error, a delay in commencing an investigation may be unreasonable because it can lead to the destruction of corroborating evidence. Here, the murder occurred on August 21, 1995, but Beasley was not arrested until January of 1996. Ten months after the murder, in early June of 1996, lead counsel was appointed. An investigator was selected by late September of 1996. Several months later in mid-January of 1997, second-chair counsel was provided and was assigned primary responsibility for the investigation. The investigator allegedly did not begin his work until September of 1997, almost two years after the murder and fifteen months after counsel was appointed. Beasley maintains that the fifteen-month delay in commencing the investigation resulted in the destruction of records that would have validated and confirmed his travel itinerary.
However, Beasley did not present any evidence to demonstrate that any records existed when lead counsel was appointed ten months after the murder, or that the records even existed at the time when Beasley was arrested, which was five months after the murder. Furthermore, Beasley did not present any evidence to establish that the investigation was dilatory. He also did not present any billing records of the investigator to establish when he engaged in any part of his work. Thus, the only evidence before the postconviction court was the testimony of defense trial counsel, and this testimony does not support Beasley's claim.
During the postconviction hearing, the evidence disclosed that a tremendous amount of time was invested in investigating Beasley's alibi through the efforts of both counsel and the investigator. The evidence suggested that although the passage of time was a hindrance, there was not an inordinate delay in the commencement of the investigation:
We did it as soon as we knew about it and had the resources to pursue it. . . . [W]e were not dilatory. [O]nce I was appointed to the case, [and] assigned . . . these investigative actions, I would have immediately taken them. I did not delay them. There w[ere] no[t] months and months that passed between the time I learned of them and the time we executed them. It would have been all within a fairly short period of time.
Though Beasley asserts on appeal that counsel delayed beginning the investigation for eight months, there are no dates or documents in the postconviction record to refute the clear testimony to the contrary. In hindsight, counsel may have theoretically salvaged some evidence if the investigation was initiated immediately upon lead counsel's appointment rather than at the time that additional members of the defense team were appointed. However, it is speculative and highly unlikely that the trail would have revealed *490 further evidence at that point because six months had already passed from the time of the murder until Beasley's arrest.
Specifically, trial counsel testified with regard to the investigation that the first step was to confer with Beasley to establish his whereabouts during the murder and the subsequent days. Initially, Beasley informed counsel that he had arranged for a drug dealer to drive him from Dundee to Tampa just before the murder would have occurred. Beasley's explanation, however, left the time frame for when this drive occurred uncertain. Moreover, Beasley was reluctant to provide the name of the drug dealer allegedly due to fear of repercussions to his family. Once in Tampa, Beasley claimed that he rented a motel room. The following day, he traveled on a bus from Tampa to Miami with a stopover in Fort Myers. In Miami, Beasley resided with friends. Beasley did not keep any receipts for his travels, which required counsel to search for documentation of Beasley's travel route.
Counsel attempted to reconstruct this journey by contacting the motel and the bus company for supporting documentation of Beasley's travel route. Once Beasley provided information with regard to his lodging on the night of the murder, counsel next attempted to establish whether a corresponding motel record existed. The motel was contacted both by telephone and in person, with the investigator having motel employees search through their records. The search was to no avail because the records were either purged or never generated.
Counsel next attempted to retrieve bus records. The investigator traveled to the bus company's administrative headquarters to locate an itinerary through either a passenger manifest "or any kind of ticketing information that might support Mr. Beasley's version of those events." The investigator also attempted to establish the bus schedules for Beasley's alleged travel dates. The defense team requested copies of any schedules or materials that could be utilized to establish that there were bus routes that would have taken Beasley along his claimed route. The predicament was that they could neither locate precise times to verify the specific buses on which Beasley traveled, nor could they obtain any ticketing information that would have corroborated Beasley's alibi. For the Miami portion of the trip, the defense team obtained evidence from witnesses with regard to when Beasley was transported from the bus station and where he stayed. Thus, defense counsel provided evidence of reasonable efforts to locate these documents, which was not refuted by any direct evidence from Beasley during the postconviction proceedings. The only support for the alleged ineffective assistance can be found in the mere argument of postconviction counsel.
During this pre-trial investigation, trial counsel repeatedly explained to Beasley that it was vitally important to establish that Beasley departed Dundee at a certain time before the murder occurred and to provide the reason for Beasley's departure. Trial counsel testified that the defense team "went down many rabbit trails" where Beasley directed counsel to investigate a specific location, but upon doing so, counsel discovered there were no records establishing that Beasley had been there. After each attempt, counsel would question Beasley for additional information, but Beasley was reluctant to assist counsel in the investigation. Beasley provided only general, vague details of his itinerary, and he refused to shed light on any of the ancillary facts. For instance, Beasley declined to reveal the name of the person who allegedly drove him to Tampa. Defense counsel testified that it was clear *491 Beasley did not want to discuss these details.
Despite Beasley's reluctance, trial counsel continued to prevail upon him to provide more complete information. For example, counsel requested information concerning a person in Latin America who had a connection to the person who allegedly drove Beasley to Tampa. Contact information for this person would have helped counsel establish the identities of pivotal, potential witnesses and whether they could provide an alibi. If the person in Latin American had provided an alibi for Beasley, counsel reasoned that from this information they could have backtracked to establish the timeline. Though Beasley provided a telephone number in Colombia, it was disconnected, which resulted in another dead end because counsel did not know even the name of the potential witness to generate further investigation.
Without Beasley providing names or more specific information, counsel could have reasonably concluded that further investigation would have been fruitless. A strategic decision to stop searching because of "rabbit trails" and vague information is not necessarily unreasonable. See Rompilla v. Beard, 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."). Here, Beasley had no receipts or any evidence with regard to his trip that may have aided the investigation, and he refused to provide specific information to aid counsel in collecting corroborating evidence of his travels. This lack of cooperation left counsel in the position of attempting to recreate the timeline based exclusively on Beasley's sparse details. The evidence presented during the evidentiary hearing demonstrated that counsel reasonably investigated all leads provided by Beasley, including questioning for additional information when encountering a dead end in the investigation, only to be met with Beasley's reluctance to provide anything more than vague details. Thus, the record contains competent, substantial evidence to support the postconviction court's determination that the performance of trial counsel was not deficient.
Beasley also claims that even allowing for the passage of time, it would have been possible to present the amount of hours that it would have taken him to travel this route and that the buses departed along that route according to a set schedule. Despite asserting the ease of this demonstration, Beasley did not submit a general timeline during the evidentiary hearing to establish deficient performance. Further, Beasley did not present any evidence to refute the evidence which demonstrated that counsel attempted to establish a general route, but could not do so based upon the documentation available during the investigation.
Beasley also cannot demonstrate prejudice for either claim because (1) trial counsel did not present a case-in-chief; thus, this evidence would not have had a forum in which to be presented, and (2) the timeline only provided a partial alibi. With regard to the former, trial counsel prepared for trial in anticipation that Beasley might choose not to testify. When Beasley declined to testify, the defense strategically decided not to present a defense case-in-chief to avoid relinquishing the primacy and recency effect in the closing argument "sandwich" or, in other words, the benefits inherent in giving both *492 first and last closing argument.[5] This was a reasonable defense strategy based on the procedural rules in force at the time of trial. See Evans v. State, 995 So.2d 933, 945 n. 16 (Fla.2008) (counsel's strategic decision to take into consideration the opportunity to have opening and closing argument was reasonable); see also Van Poyck v. State, 694 So.2d 686, 697 (Fla. 1997) (concluding that there were tactical reasons for limiting the presentation of evidence, such as preserving the opportunity to give two closing arguments during the guilt phase). Thus, there would have been no forum available for the defense to present a generic timeline without abandoning a strategic procedural advantage.
Furthermore, even if Beasley's counsel had presented evidence solely to establish the timeline, the general timeline had extremely weak probative and exculpatory value. In circumstances where the investigative delay was much longer than that here, this Court has held that a defendant did not suffer prejudice for counsel's failure to investigate evidence of a partial alibi. See Overton v. State, 976 So.2d 536, 557 (Fla.2007) (no actual prejudice from five-year delay because alibi witnesses would only provide an incomplete alibi at best). Similarly, Beasley did not establish that he suffered prejudice because the timeline only provided a partial alibi. The evidence during trial confirmed that Mrs. Monfort left the apartments where she was last seen alive between 5:30 and 5:45 p.m. on the evening of the murder. Beasley claimed that the drug dealer drove him to Tampa at 7 p.m. This left an hour unaccounted for in the timeline. Additionally, because Beasley refused to provide the drug dealer's name and refused to testify, counsel could not demonstrate that Beasley actually left town at 7 p.m. Therefore, even if bus records had been investigated in a more expedient manner and a general timeline had been presented, Beasley still had no alibi for the time between 5:30 and 7 p.m. Cf. Lott v. State, 931 So.2d 807, 815 (Fla.2006) (holding that the failure to investigate an alibi did not constitute ineffective assistance because "even if the jury believed that Lott did speak with Jones on the Sunday afternoon in question, it still would have left plenty of room in the twenty-seven hour timeline for Lott to have committed the murder"); Reed v. State, 875 So.2d 415, 429-30 (Fla. 2004) (holding that there was no deficient performance with regard to the failure to investigate the alibi claim because "the available testimony provided, at best, an incomplete alibi," where the testimony still allowed for a two- to three-hour window for the defendant to commit the murder). Thus, sufficient time remained for Beasley to have committed the murder before he left Dundee based on the uncertain departure time provided by Beasley and the range in time of death provided by the medical examiner.
In addition, whereas the timeline could have provided some evidence contrary to the State's case, it was refuted by a witness who testified that he saw Beasley drive the victim's vehicle on the night of the murder. As previously observed:

*493 There is no reasonable defense hypothesis which can reconcile a theory that Mrs. Monfort came home with her car after 7 p.m. on August 21 with the conclusion "that a jury might fairly and reasonably infer from the evidence" that Beasleywho was supposed to have left by thenwas seen by Robinson later that night driving Mrs. Monfort's car. There was substantial, competent evidence (in the form of the direct testimony of Dale Robinson) to support the conclusion that Beasley had Mrs. Monfort's car on the night of the murder.
Beasley, 774 So.2d at 658.
Next, admission of general bus records would not exculpate Beasley because unspecific records would not prove that he was actually present on the bus. Further, the bus records would have only established his actions on the day following the murder. Hence, the strategy for establishing the timeline was not to exculpate Beasley for the murder but to demonstrate that Beasley left Dundee to contact friends in Miami and was not fleeing because of consciousness of guilt from having committed this murder. This was necessary to refute the State's allegation that Beasley fled Dundee to escape arrest for the murder. Therefore, the impact of establishing the timeline through general itineraries is not so great that it undermines our confidence in the trial proceedings. Accordingly, we affirm the postconviction court's denial of this claim because Beasley did not establish that the performance of counsel was deficient or that the failure to present a timeline of Beasley's travel from Dundee establishes prejudice as required by law.

Presentation of Testimony that Beasley Often Rode in Mrs. Monfort's Vehicle
Beasley maintains that the failure to present Michael Lykins as a witness prevented the jury from hearing testimony that Beasley regularly drove Mrs. Monfort's vehicle and, therefore, resulted in a failure to demonstrate a reasonable hypothesis of innocence. Beasley asserts that this testimony would have demonstrated that the DNA recovered from the cigarette butts left in the Monfort vehicle, which was consistent with Beasley's DNA, was not necessarily inculpatory because Beasley could have left the cigarettes in the vehicle before the murder. In addition, Beasley advances that Mr. Lykins' testimony would have refuted the State's evidence that Beasley drove the victim's vehicle between 8:00 and 10:00 p.m. on the night of the murder because the witness to that incident was unable to identify the specific date on which the sighting occurred. Beasley additionally asserts that Mr. Lykins' testimony would have contradicted the assertion of Mrs. Monfort's daughter that she never saw Beasley drive the victim's vehicle.
"[T]he failure to call witnesses can constitute ineffective assistance of counsel if the witnesses may have been able to cast doubt on the defendant's guilt, and the defendant states in his motion the witnesses' names and the substance of their testimony, and explains how the omission prejudiced the outcome of the trial." Ford v. State, 825 So.2d 358, 360-61 (Fla.2002) (quoting and approving Jackson v. State, 711 So.2d 1371, 1372 (Fla. 4th DCA 1998)). Therefore, to establish this claim, Beasley was required to provide the substance of Mr. Lykins' testimony and explain in detail how Mr. Lykins would have been able to cast doubt on Beasley's guilt. However, the only indication of the substance of Mr. Lykins' testimony was advanced through the testimony of defense counsel and the speculative argument of postconviction counsel because Mr. Lykins did not testify during the trial and no proffer of Mr. *494 Lykins' testimony was made during the evidentiary hearing.
Counsel testified that they made a strategic decision not to present Mr. Lykins as a witness based on his unavailability and the substance of his potential testimony. Cf. Occhicone, 768 So.2d at 1048. Prior to trial, counsel made an effort to investigate Mr. Lykins, which included a pre-trial deposition. However, Mr. Lykins proved difficult to locate, and his whereabouts were unknown during the trial. Beasley did not present any evidence to refute counsel's testimony with regard to the unsuccessful attempts to locate Mr. Lykins. Thus, counsel cannot be faulted for failing to present an unavailable witness.
Furthermore, Mr. Lykins was originally listed as a State witness but was not presented at trial. To present this testimony would have required the presentation of a defense case-in-chief and would have caused the loss of any strategic procedural advantage in possessing the first and last closing argument. Assuming that Mr. Lykins' testimony was only slightly probative, if even that, defense counsel determined that the value of the testimony did not outweigh the danger in presenting a case-in-chief, facing cross-examination, and relinquishing the primacy effect of the closing argument order.
There was also evidence that presenting Mr. Lykins' testimony was strategically unnecessary because the State did not advance a theory that Beasley never rode in the vehicle prior to the murder and other evidence established that Beasley drove and rode in the vehicle. This was not a stranger-on-stranger homicide where the DNA discovered on the cigarette butts would have been probative of a theory that the perpetrator was unknown to Mrs. Monfort and would only have cause to be in the vehicle pursuant to the murder. The evidence presented during trial demonstrated that Beasley lived in Mrs. Monfort's home and that she transported him in her vehicle. This provided a sufficient, innocent explanation for his DNA being present on the cigarette butts found in the victim's vehicle. The State did not present any affirmative evidence that the cigarette butts were incriminating or that they would not have been in the vehicle but for Beasley having committed the murder. Thus, the cigarette butts were a "nonissue" and it was unnecessary to provide additional evidence of Beasley's access to the vehicle.
Defense counsel was concerned about the allegation that Beasley had the car on the day of the murder and therefore was responsible for its disappearance, not by the connection between Beasley and the car. Mr. Lykins' testimony would not have addressed that allegation in any way. Trial counsel also explained during the evidentiary hearing that Mr. Lykins could not specify the exact date on which he observed Beasley in the vehicle. Cf. Lott, 931 So.2d at 815 (failure to present alibi testimony was not prejudicial because it was of minimal value when it lacked corroboration of a specific date and time). The deposition of Mr. Lykins only revealed cumulative evidence that could have been used by the defense, but was not definitively exculpatory. Thus, this possible testimony does not undermine our confidence in the trial proceedings. Cf. Ford, 825 So.2d at 361.
Our decision on direct appeal also supports this conclusion. Six other witnesses testified with regard to Beasley's use of the vehicle. It is unlikely that the alleged testimony would have carried such probative value that it would cast doubt on the other testimony, which is demonstrated by our analysis of Beasley's asserted hypothesis of innocence on direct appeal. In that analysis, we noted that there was evidence *495 that Beasley was "always a passenger in the car." Beasley, 774 So.2d at 659. Thus, a review of the evidence reveals competent, substantial evidence to support the postconviction court's findings, and we affirm the postconviction court's denial of this claim.

Counsel's Preparation of Beasley to Testify During Trial
Beasley asserts that counsel interfered with his right to testify by failing to adequately prepare him for examination, which caused him to waive his right to testify in his own defense. A criminal defendant has a fundamental right to testify on his own behalf during his trial. See Morris v. State, 931 So.2d 821, 833 (Fla. 2006); see also United States v. Teague, 953 F.2d 1525, 1530 (11th Cir.1992) (stating the Fifth Amendment, the Sixth Amendment, and the Due Process Clause of the Fourteenth Amendment support the defendant's right to testify). A defendant must express a knowing, intelligent, and voluntary waiver of this personal right. See Deaton v. Dugger, 635 So.2d 4, 8 (Fla. 1993); Torres-Arboledo v. State, 524 So.2d 403, 410-11 (Fla.1988). As discussed by the federal appellate court for this circuit:
Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide. This advice is crucial because there can be no effective waiver of a fundamental constitutional right unless there is an "intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (emphasis added). Moreover, if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify. The defendant can then make the choice of whether to take the stand with the advice of competent counsel.
Teague, 953 F.2d at 1533 (footnotes omitted) (parallel citations omitted).
While defense counsel has an obligation to inform the defendant of the right to testify, see Morris, 931 So.2d at 833, there is no bright-line rule concerning the minimum amount of time that is necessary to constitute adequate preparation of a defendant to testify during trial:
Where the defendant claims a violation of his right to testify by defense counsel, the essence of the claim is that the action or inaction of the attorney deprived the defendant of the ability to choose whether or not to testify in his own behalf. In other words, by not protecting the defendant's right to testify, defense counsel's performance fell below the constitutional minimum, thereby violating the first prong of the Strickland test. For example, . . . if defense counsel never informed the defendant of the right to testify, and that the ultimate decision belongs to the defendant, counsel would have neglected the vital professional responsibility of ensuring that the defendant's right to testify is protected and that any waiver of that right is knowing[, intelligent,] and voluntary. Under such circumstances, defense counsel has not acted "`within the range of competence demanded of attorneys in criminal cases,'" and the defendant clearly has not received reasonably effective assistance of counsel. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052 (quoting McMann v. Richardson, 397 U.S. 759, 770-71, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)).
Teague, 953 F.2d at 1534 (parallel citations omitted). Here, Beasley does not assert that trial counsel failed to inform him of *496 his right to testify. The attack here focuses exclusively on the quantity of time counsel expended to inform him of his right to testify and to prepare him for examination. Thus, to prevail on a claim that ineffectiveness here interfered with his right to testify, Beasley must demonstrate that trial counsel's preparation for his testimony was deficient such that it deprived Beasley of the ability to choose whether to testify on his own behalf and that this deficiency prejudiced Beasley.
During the evidentiary hearing, Beasley did not testify that counsel failed to adequately inform him of his right to testify, or that he would have testified during the trial if counsel had spent more time preparing him. Beasley's postconviction counsel alluded to jail records, which allegedly established that defense counsel spent only thirty minutes preparing Beasley on the evening before Beasley was supposed to testify. However, Beasley did not introduce those records into evidence, and neither defense trial counsel remembered the specific length of time allowed by the jail. In the absence of evidence to support this claim, our review is limited to the actual testimony with regard to the strategy and performance of counsel.
A strategic decision does not constitute ineffective assistance "if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone, 768 So.2d at 1048. "Placing a defendant on the stand to testify is always a tactical decision because the State can ask the defendant about prior felony convictions. In choosing whether to testify, a defendant must weigh the benefits and detriments of allowing this information to be supplied to the jury." Pangburn v. State, 661 So.2d 1182, 1190 (Fla.1995). Trial counsel here strongly believed that Beasley should testify in his defense and informed him of this right. Counsel was of the view that the State presented an entirely circumstantial case; therefore, it was necessary for Beasley to take the stand, "look [the jury] in the eye," and assert his innocence. In counsel's opinion, it was also necessary for Beasley to explain to the jury that he did not leave town under suspicious circumstances and to address other aspects of the State's case.
The evidence demonstrates that counsel discussed both the positive and negative aspects of testifying with Beasley. Counsel presumed that Beasley's strategic reasons for declining to testify were probably (1) to avoid presenting a negative image to the jury through possible impeachment by his prior convictions for worthless checks, and (2) a belief that his testimony was unnecessary because counsel had adequately rebutted the State's case. Beasley believed that defense counsel had done so much damage to the State's circumstantial case that if he testified in his own defense, and the jury discovered his criminal history, it would undo much of this successful effort by the defense.
Beasley never indicated to trial counsel that his decision to not testify was based on lack of preparation. Trial counsel did not recall Beasley alerting them that he needed more time to prepare to testify after his discussion with counsel. There is no evidence that Beasley even hesitated with regard to testifying or that he expressed a concern that he needed more preparation to testify. The record establishes that if Beasley had expressed that concern, counsel would have requested a recess to undertake whatever discussions Beasley desired. The trial court was always solicitous in providing the defense with as much time as they needed for discussions with their client. Specifically, after the State rested, the trial court allowed the defense a "fairly significant *497 amount of time" to discuss with Beasley the strategic decision to testify. The trial transcript also reveals that defense counsel informed the trial court that discussions extended five hours with Beasley the previous night in preparation for his testimony, not the thirty minutes alleged by postconviction counsel during the evidentiary hearing.
Furthermore, Beasley's last-minute decision to not testify required counsel to entirely re-work the closing argument that had been previously prepared based on the assumption that Beasley would testify. Consequently, the trial court granted the defense team time to regroup. The trial court also conducted a colloquy with Beasley to determine whether he knowingly, intelligently, and voluntarily waived his right to testify:
THE COURT: Okay. I have been informed by counsel that they intend to rest at this time and that you intend to not testify. Is that correct?
BEASLEY: That's true.
THE COURT: What I want to make sure you understand is the right to remain silent, or, for that matter, the right to testify, although we always put it in the reverse, is your right. That's not [counsel's] right, . . . it's not my right or the State's right. That is your right to make that decision. Are you clear about that?
BEASLEY: Very clear, yes ma'am.
THE COURT: And as I understand, you've sought advice of counsel. But have you independently made a decision whether to testify or not?
BEASLEY: I think I independently made the decision without counsel, and then we discussed it and then we all came to the same conclusion.
THE COURT: And that conclusion was?
BEASLEY: Not to testify.
THE COURT: Anything else in that regard; do you have any inquiry about it or need any further time with counsel?

BEASLEY: No ma'am, everything's fine.

THE COURT: Okay. So I understand, you understand that's your right, and you have waived that right not to testify, and you have exercised the right to remain silent, or not to testify?
BEASLEY: That's true, yes ma'am.
(Emphasis supplied.) Thus, the trial court specifically asked Beasley if he needed further time with counsel, and Beasley declined that opportunity.
This opportunity, combined with the representation that counsel spent five hours with Beasley in preparation, provides competent, substantial evidence to support the postconviction court's determination that trial counsel was not deficient in preparing Beasley to testify. Additionally, Beasley failed to present any evidence during the postconviction hearing to support a determination that he was prejudiced by the performance here. We affirm the postconviction court's denial of this subclaim.

Development of an Alternative Suspect
Beasley maintains that trial counsel should have tested the State's case by presenting a coherent, alternative theory for the murder by highlighting a discrepancy in a witness's testimony and by implicating another individual as a possible murder suspect. The purpose of presenting additional testimony would have been to cast doubt on the State's timeline as to when Mrs. Monfort arrived home on the afternoon of the murder and to demonstrate that the alternative suspect was one of the individuals at the apartments when Mr. Rosario gave cash to Mrs. Monfort. For instance, the testimony of Mr. Rosario, *498 a prospective tenant of Mrs. Monfort, apparently contained a discrepancy with regard to the timing of his meeting with Mrs. Monfort on the day of the murder. Additionally, Mr. Rosario's testimony indicated that several people witnessed the meeting and his cash transaction with Mrs. Monfort. One of those individuals had an injured leg, which fit the description of an injury to an individual that the defense team considered as a possible suspect. Beasley asserts that defense counsel should have moved for the trial court to reconsider the motion in limine concerning this individual's connection to two prior murders and should have cast this individual as the actual assailant during trial.
The postconviction court denied this claim because counsel testified that the defense team considered developing evidence that this individual was a potential suspect, but there was insufficient information to construct a viable presentation of this alternative theory. Postconviction counsel did not present the testimony of Mr. Rosario, the alternative suspect, or any other witness who could explain the basis for this claim. The purported discrepancy in Mr. Rosario's testimony with regard to the timing of his meeting with Mrs. Monfort was only addressed through questions, and defense trial counsel did not recall any such discrepancy.
With regard to presenting another possible perpetrator of the murder, the defense team initially focused on the alternative suspect as the "strawman," which is a person who could have committed the crime. The defense team attempted to locate evidence that would link the alternative suspect to the apartments to develop a theory that would implicate him in the murder. However, counsel was unable to develop any further evidence or concrete leads that would provide a basis for requesting the trial court to reconsider the motion in limine with regard to the alternative suspect.
Counsel had hoped that the State would call the "strawman" as a witness, thus allowing the defense to "put the issue in play" and assert the possibility of his involvement in the murder through cross-examination. When the State did not present this witness, the defense was required to consider the tactical issues with regard to calling him as a defense witness. Counsel explained that the defense strategy with regard to the alternative suspect depended on whether Beasley would testify.
[If Beasley decided to testify,] we would want to have other straw men in place. So during the guilt phase of the trial, there were efforts made to put suspicion on other people. As far as actually calling [the alternative suspect] as a defense witness, the dynamics of it were not something that I would do. If the state had called him as a witness, I would have done back flips at the prospects of cross-examining him and creating the inferences and the feelings that that would create on the part of the jury. But to actually call him as a defense witness and to try to play Perry Mason and call who we think did it and then put them on the stand . . . under the guise of, okay, we're calling the guy that we think did it and we're going to show you he did it . . . we would have [fallen] flat on our face[s]. . . . [I]f there was evidence that [the alternative suspect] did this murder, above and beyond some things that you could point to that raise a question, he would be charged with murder. . . . [D]id he have motive? Yes. Did he have opportunity? Yes. Did he have means? Theoretically, anybody could have. And what it boils down to is what hard evidence was there he did it.
*499 Hence, when the State did not present this witness and Beasley decided not to testify, the defense made a strategic decision to not present a defense case-in-chief by calling the alternative suspect. Trial counsel explained:
It is dramatically different when the defense is able to cross examine a state witness and show that the witness is hiding something. That is devastating. But when it comes to the phase of the defense case, to try to put on a defense that someone else did it, you're put in the position of having to come forward with some credible evidence that someone else might have done it, with the state attorney laying back ready for cross-exam, and the bottom line of it is you're going to fall on your face; I mean, because you can't prove the other guy did it. If there was evidence the other guy did it, he would be charged.
Furthermore, there were several factors that made the alternative suspect appear suspicious, but there was no definitive proof to tie him to the murder. The alternative suspect was not equally implicated in the murder because there was circumstantial evidence linking Beasley to the murder that did not also implicate the alternative suspect:
[He] wasn't the person who was living with Mrs. Monfort. He wasn't the person whose bloody shirt was allegedly found in his room. He wasn't the person who left the area, changed his appearance, adopted an alias. . . . [T]here were lots of other things that were being thrown at Mr. Beasley in terms of . . . the circumstantial evidence of his guilt that didn't apply to [the alternative suspect].. . . [T]he overall dynamic of the approach to the defense theory of the case [was that we] were attacking the circumstantial evidence against Mr. Beasley. . . . We are trying to develop what evidence we can as to someone else committing the murder. . . . [H]ad Mr. Beasley taken the stand, the perpetrator of choice would not have been [the alternative suspect] through Mr. Beasley's testimony.
In addition, Beasley did not provide his defense team with evidence in support of the theory that this alternative individual was a possible suspect because Beasley contended that an unnamed drug dealer murdered Mrs. Monfort. Thus, defense counsel determined that there was no basis for reconsidering the trial court's ruling on the motion in limine because the alternative suspect's alleged involvement in past murders was not relevant to Beasley's trial proceedings. However, defense counsel attempted to implicate other individuals as possible perpetrators during the trial, such as highlighting through argument and cross-examination that several individuals witnessed Mr. Rosario hand Mrs. Monfort a large sum of money. Within the scope of the State's case, the defense team did attempt to develop other potential suspects as part of their overall strategy.
Beasley did not present any evidence to refute the evidence that Mr. Rosario's testimony did not contain any discrepancies. Trial counsel also provided reasonable, strategic explanations for not presenting the alternative suspect as a witness or further implicating him in the crime. Thus, we affirm the postconviction court's ruling on this claim because the performance of counsel was not deficient and Beasley has not demonstrated prejudice as required by law.

CONCLUSION
For the reasons stated above, we affirm the postconviction court's order denying Beasley's amended rule 3.851 motion.
It is so ordered.
*500 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, and POLSTON, JJ., concur.
PARIENTE, J., concurs with an opinion.
LABARGA and PERRY, JJ., did not participate.
PARIENTE, J., concurring.
I fully concur in the majority opinion, which affirms the circuit court's order denying postconviction relief. I write only to address one concrete issue: the majority's discussion of Brady[6] and Youngblood[7] claims in reference to the missing voicemail. In this case, the defendant raised the issue of the voicemail as one of ineffective assistance of counsel; however, he also makes reference to both Brady and Youngblood. Beasley's claim focuses on the allegation that counsel rendered ineffective assistance by failing to investigate or address the voicemail.
The bottom line, however, is whether raised as an ineffective assistance of counsel claim, a Brady claim, or a Youngblood claim, Beasley did not demonstrate the basic foundation for any of these claims that the voicemail even existed or that the State ever possessed the tape. See, e.g., Guzman v. State, 868 So.2d 498, 509-10 (Fla.2003) (analyzing, in the alternative, claims involving Brady and Youngblood, as well as an ineffective assistance of counsel claim).
Because the majority opinion discusses both Brady and Youngblood, I write to emphasize that those cases involve two different tests regarding evidence possessed by the State. As the majority correctly recognizes, to establish a Brady violation, the defendant has the burden to show (1) that favorable evidenceeither exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) that because the evidence was material, the defendant was prejudiced. See Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Way v. State, 760 So.2d 903, 910 (Fla.2000). A defendant never needs to show bad-faith destruction to establish a Brady violation. Likewise, the Court does not use a different standard under a Brady analysis where the defendant asserts that evidence was "potentially favorable." See, e.g., Guzman, 868 So.2d at 508.
A Youngblood claim, in contrast, addresses a claim that the State lost or destroyed favorable evidence in bad faith where the police believe that the evidence would exonerate a defendant. "The loss or destruction of evidence that is potentially useful to the defense violates due process only if the defendant can show bad faith on the part of the police or prosecution." Guzman, 868 So.2d at 509 (citing Youngblood, 488 U.S. at 51, 109 S.Ct. 333) (emphasis added). As this Court has recognized, the "`presence or absence of bad faith . . . must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.' [Youngblood, 488 U.S.] at 57 n.*, 109 S.Ct. 333. Evidence that has not been examined or tested by government agents does not have `apparent exculpatory value' and thus cannot form the basis of a claim of bad faith destruction of evidence." Guzman, 868 So.2d at 509. Thus, where a defendant asserts that the State destroyed potentially useful evidence, the Court applies a Youngblood analysis.
*501 Regardless of the discussion of Youngblood and Brady, in this case Beasley's claim, as pointed out by the majority, is speculative in every way. Beasley cannot demonstrate that his trial counsel was ineffective because he failed to demonstrate the basic foundation of this claimthat the voicemail even existed or that the State ever possessed the tape. Likewise, for the same reason, he necessarily failed to show a Brady or Youngblood violation.
NOTES
[1] In determining that the death sentence was appropriate, the trial court found two aggravating circumstances: (1) the merged factor that Beasley was engaged in a robbery at the time of the murder and the murder was committed for financial gain to facilitate taking the victim's money (some weight); and (2) the murder was especially heinous, atrocious, or cruel ("HAC") (very great weight). In addition, the trial court found the following mitigating circumstances under section 921.141(6)(h), Florida Statutes (1997):(1) Beasley was a good citizen who served in the military; was a good worker; had a substance-abuse disorder; was impacted by a friend's suicide; had no prior criminal convictions for violent crimes; and maintained contact with his children and grandchildren (some weight); (2) Beasley's marriage failed; he failed to complete college; he had good manners and a good personality; he was a good son, friend, brother, student, and athlete; he had participated in extracurricular activities throughout school and in church as a youth; he was self-sufficient and reliant; he had some periods of financial irresponsibility due to a recurrent substance-abuse disorder and an alcohol problem, which occurred for approximately two years following his divorce; he was generally financially responsible (little weight); and (3) he was a musician (very little weight). The trial court also considered and found the following additional mitigating circumstances: (1) circumstances with regard to the results of his psychological tests, which did not prove extreme mental or emotional disturbance or substantial incapacity (some weight); (2) factors which related to Beasley's ability to serve a life sentence without difficulty (little weight); and (3) factors relating to Beasley's post-incident conduct, such as being cooperative during his arrest, extradition, and incarceration, and that he maintained good family relationships while incarcerated (some weight).
[2] On direct appeal, Beasley raised the following issues: (1) the trial court erred in denying his motion for judgment of acquittal at the close of the evidence; (2) his conviction for first-degree murder was not supported by competent, substantial evidence; (3) the trial court erred in denying his request to invoke the rule of sequestration for the victim's daughter and son; (4) the trial court erred in finding the HAC aggravating circumstance; (5) the trial court erred in finding the aggravating circumstances that the capital felony was committed while Beasley was engaged in the commission of a robbery and for financial gain; (6) the trial court erred in rejecting as mitigating factors Beasley's poor and rural background, the effect on Beasley of the death of his father, Beasley's expressions of sorrow with regard to the victim's death and gratitude for her kindness (coupled with his continued claim of innocence), and Beasley's good behavior during the trial; and (7) the proportionality of Beasley's death sentence. See Beasley, 774 So.2d at 657 n. 4.
[3] Beasley failed to properly preserve and present any argument with regard to claims two through six. For claims two and three, Beasley merely asserted in his brief that he stood "on the record without further argument." Beasley did not present any position with regard to claims four through six. "The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived." Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990); see also Coolen v. State, 696 So.2d 738, 742 n. 2 (Fla.1997) (stating that a failure to fully brief and argue points on appeal "constitutes a waiver of these claims"). Even if these claims had been properly pled, they are meritless. Beasley did not present evidence during the hearing to refute the testimony with regard to claims two and three, and the testimony presented provides competent, substantial evidence to support the postconviction court's factual findings with regard to the performance of counsel. For claims four through six, which were summarily denied without an evidentiary hearing, Beasley failed to present these issues before this Court. Moreover, claims four and five have been repeatedly rejected by this Court. See, e.g., Tompkins v. State, 994 So.2d 1072, 1080-82 (Fla.2008) (concerning claims four and five, this Court has continually upheld the constitutionality of Florida's capital-sentencing scheme and lethal-injection protocol). With regard to claim six, Beasley failed to advance any meritorious claim of error, and his cumulative error claim is also without merit. See Griffin v. State, 866 So.2d 1, 22 (Fla.2003) (concerning claim six, where allegations of individual error are either procedurally barred or without merit, the claim of cumulative error is also without merit).
[4] On appeal, Beasley asserts that counsel's errors were two-fold: the failure to hire a blood-spatter expert and also a forensic crime scene expert. However, the trial court was only presented with the question of whether counsel should have hired a forensic crime scene expert. The question of consultation with a blood-spatter expert was developed during the evidentiary hearing when counsel testified that the hiring of a blood-spatter expert may have been considered.
[5] When Beasley was prosecuted in 1998, the defense was permitted to give both the opening and rebuttal closing arguments if it did not present a case-in-chief. Since Beasley's trial, the Legislature has enacted section 918.19, Florida Statutes (2007), which provides that the State shall give opening and rebuttal closing arguments. Correspondingly, this Court amended Florida Rule of Criminal Procedure 3.250 and adopted Florida Rule of Criminal Procedure 3.381, confirming that the State is entitled to opening and rebuttal closing arguments even if the defense presents no case-in-chief. See In re Amendments to Fla. Rules of Crim. Pro.Final Arguments, 957 So.2d 1164, 1166-67 (Fla.2007).
[6] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[7] Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).